R. C. W., SUPERVISOR, INC., Plaintiff,

v.

CUBAN TOBACCO COMPANY, Inc. and Robert W. Dill as Collector of Customs of the Port of New York, Defendants.

United States District Court
S. D. New York.
July 18, 1963.

454

Rabinowitz & Boudin, New York City, for plaintiff; Leonard B. Boudin, Henry Winestine, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., for defendant Robert W. Dill as Collector of Customs of the Port of New York; An-

thony H. Atlas, Asst. U. S. Atty., of counsel.

Chadbourne, Parke, Whiteside & Wolff, New York City, for defendant Cuban Tobacco Co., Inc.; Edward R. Neaher, Eugene R. Anderson, New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge.

Plaintiff R.C.W., Supervisor, Inc., (R. C.W.) sues to enjoin defendant, the Collector of Customs for the Port of New York, from giving effect to a directive of the Commissioner of Customs. The directive gives notice to customs officials throughout the United States of the recordation by defendant Cuban Tobacco Company, Inc. (Cuban Tobacco) of the trademarks "Cabanas" and "H. De Cabanas y Carbajal" pursuant to the provisions of § 42 of the Lanham Act (15 U.S.C. § 1124).[1] The effect of the recordation under § 42 is to make it illegal under § 526 of the Tariff Act of 1930 (19 U.S.C. § 1526) to import into the United States cigars bearing either of the recorded marks without consent of the recording party.[2]

R.C.W. also seeks to enjoin defendant Cuban Tobacco from interfering with its importation and distribution of cigars bearing these marks. Finally it seeks judgment declaring that Cuban Tobacco is not the rightful owner of the trademarks in question.

Cuban Tobacco has counterclaimed to enjoin R.C.W. from infringing the marks, which it claims rightfully belong to it, and from importing into the United States and distributing here cigars bearing the marks or any imitation of them. Cuban Tobacco also seeks an accounting of its damages and plaintiff's profits resulting from the alleged infringement and demands treble damages. Finally it seeks an injunction restraining plaintiff from paying to anyone but it, the price or value of any goods bearing the marks or its trade name.

1. 15 U.S.C. § 1124—"No article of imported merchandise which shall copy or simulate the name of the [sic] any domestic manufacture, or manufacturer, or trader, or of any manufacturer or trader located in any foreign country which, by treaty, convention, or law affords similar privileges to citizens of the United States, or which shall copy or simulate a trade-mark registered in accordance with the provisions of this chapter or shall bear a name or mark calculated to induce the public to believe that the article is manufactured in the United States, or that it is manufactured in any foreign country or locality other than the country or locality in which it is in fact manufactured, shall be admitted to entry at any custom house of the United States; and, in order to aid the officers of the customs in enforcing this prohibition, any domestic manufacturer or trader, and any foreign manufacturer or trader, who is entitled under the provisions of a treaty, convention, declaration, or agreement between the United States and any foreign country to the advantages afforded by law to citizens of the United States in respect to trade-marks and commercial names, may require his name and residence, and the name of the locality in which his goods are manufactured, and a copy of the certificate of registration of his trade-mark, issued in accordance with the provisions of this chapter, to be recorded in books which shall be kept for this purpose in the Department of the Treasury, under such regulations as the Secretary of the Treasury shall prescribe, and may furnish to the Department facsimiles of his name, the name of the locality in which his goods are manufactured, or of his registered trade-mark, and thereupon the Secretary of the Treasury shall cause one or more copies of the same to be transmitted to each collector or other proper officer of customs."

2. 19 U.S.C. § 1526(a). "It shall be unlawful to import into the United States any merchandise of foreign manufacture if such merchandise, or the label, sign, print, package, wrapper, or receptacle, bears a trade-mark owned by a citizen of, or by a corporation or association created or organized within, the United States, and registered in the Patent Office by a person domiciled in the United States, under the provisions of sections 81–109 of Title 15, and if a copy of the certificate of registration of such trade-mark is filed with the Secretary of the Treasury, in the manner provided in section 106 of said Title 15, unless written consent of the owner of such trade-mark is produced at the time of making entry."

Jurisdiction is based on the Lanham Act (15 U.S.C. §§ 1051–1127).

Plaintiff has now moved for a temporary injunction, pursuant to Rule 65, F.R.Civ.P., asking that the activities against which it is seeking permanent injunctive relief be enjoined during the pendency of the litigation. It seeks to have the Collector of Customs restrained, pendente lite, from giving effect to the directive of the Commissioner of Customs, and Cuban Tobacco restrained, pendente lite, from interfering with the importation and distribution of cigars bearing the disputed trademarks.

R. C. W. alleges that because cigars have to be kept under carefully controlled conditions to retain their freshness, those which are being held by the Collector of Customs pursuant to the recordation will become worthless if kept for the duration of the litigation and that, therefore, unless preliminary relief is granted it will suffer irreparable harm. It also alleges irreparable damage arising from a disruption of its business.

Cuban Tobacco has cross-moved, pursuant to Rule 65, for a temporary injunction to restrain plaintiff from importing or distributing cigars bearing defendant's corporate name, the trademarks in question, or any imitation thereof during the pendency of the litigation.

Defendant Collector of Customs opposes plaintiff's motion and takes no position with regard to the cross-motion of defendant Cuban Tobacco.

The facts pertinent to this controversy are as follows:

A trademark which consists of the name "H. De Cabanas Y Carbajal" and a monogram displayed within an oval frame, was first registered in the United States on August 7, 1906 under the Trade-Mark Act of 1905 by H. De Cabanas Y Carbajal (De Cabanas), a New Jersey corporation which was wholly owned by Cuban Tobacco. The presently subsisting registration of the mark and monogram, No. 313,205 was made by De Cabanas on May 22, 1934, also under the Act of 1905.

In 1952 De Cabanas was liquidated and defendant Cuban Tobacco succeeded to the ownership of the mark and registration pursuant to an "Instrument of Transfer and Assignment" dated March 31, 1952. The assignment of registered trademarks was recorded in the United States Patent Office on June 3, 1952 and in 1954 Cuban Tobacco renewed the registration of the mark under the Trade-Mark Act of 1946.

A second trademark which consists simply of the name "Cabanas" was registered by Cuban Tobacco, registration No. 678,758, on May 19, 1959 on the Principal Register established by the Trade-Mark Act of 1946.

The brands of cigars on which these marks are used and with which this litigation is concerned have been on the market for over 35 years. They are "clear Havana" cigars of different sizes and shapes. They have the reputation of being among the finest cigars on the market.

During the early 1930's these cigars were produced in the United States in Trenton, New Jersey.[3] In October of 1934, however, manufacture was shifted to Cuba and they were produced in that country exclusively until 1961.

On July 9, 1951 De Cabanas, the owner of the United States trademarks under which the cigars were then being sold in this country, and Tabacalera Cubana, S. A., (Tabacalera), the owner of the brand rights in Cuba and the actual manufacturer of the cigars since 1934, made an agreement clarifying the relationship between the two firms and expanding Tabacalera's rights in the world cigar market. Tabacalera was a Cuban corporation, wholly owned by defendant Cuban Tobacco, at the time.

By the terms of the agreement De Cabanas granted Tabacalera the privilege

---

3. It should be noted that the phrase "clear Havana" is descriptive of a cigar whose binder, filler, and wrapper are made solely of Cuban grown tobacco. "Clear Havana" cigars are not necessarily manufactured in Cuba. See United States Tariff Commission Report, No. 62, 2d Series (1933) p. 6.

of marketing cigars under all the brand names owned by De Cabanas, throughout the world. Tabacalera, in turn, agreed that the cigars so marketed would be manufactured in conformity with the standard of quality and characteristics prescribed by De Cabanas, and that De Cabanas would have the right at any time to inspect the leaf tobacco and supervise the processes and methods of manufacture of the cigars. De Cabanas was to "at all times and in all respects have and retain full control over the standards of quality and characteristics of said brands."

The agreement also provided that "said trade-marks, brands, labels and trade names shall continue to be the property of Cabanas and that Tabacalera has and shall claim no right or title therein." De Cabanas specifically reserved the right to manufacture or market all of the brands of cigars involved any place in the world.

In 1952, when De Cabanas was liquidated, its parent, Cuban Tobacco, succeeded to its rights under this agreement. The rights of Cuban Tobacco and Tabacalera as to the production and distribution of H. De Cabanas y Carbajal and Cabanas cigars and the trademark rights thereto were governed by this agreement until 1960. Both companies apparently abided by the terms of the contract and, on the record now before me, there is no evidence of any dispute between them up to that point.

On December 31, 1958 the revolution in Cuba, known as the Movement of July 26th, was successful in overthrowing the Batista regime, then in power, and Fidel Castro, the leader of the revolt, assumed de facto control over the island. On January 7, 1959 the United States formally extended recognition to the new revolutionary government. However, with the passage of months relations between this country and the Castro regime cooled and reached a low point with the accusation by the United States that Castro had betrayed the revolution, had become a puppet of the Soviet Union, and had permitted that country to gain a military and political foothold in the Western Hemisphere, in violation of the Monroe Doctrine and various pronouncements of the Organization of American States. The naval quarantine which this country imposed upon Cuba at that point is recent history.

A complete review of the incidents involved in the deterioration of relations between the United States and Cuba is plainly unnecessary for the purposes of this motion. It is significant, nevertheless, that the Council of Ministers of Cuba on July 6, 1960 enacted Law No. 851 authorizing the President and Prime Minister of that nation "to nationalize, through forced expropriations, the properties or enterprises owned by physical and corporate persons who are nationals of the United States * * * or of the enterprise in which such physical and corporate persons have an interest, even though they be organized under the Cuban laws" if it be deemed "advisable or desirable for the protection of the national interests."

On September 16, 1960 an official of the Castro government, acting pursuant to a resolution of the Minister of Labor, dated September 15, 1960, took over the management and operation of Tabacalera and the custody of all its properties. Thereafter by Resolution No. 3 of October 24, 1960, President Dorticos and Prime Minister Castro, by reason of alleged "unscrupulous and criminal" attacks by the United States against Cuba, ordered the "nationalization by compulsory expropriation" of the properties encompassed by Law No. 851, including the property of Tabacalera, which was wholly owned by Cuban Tobacco, an American corporation, in Cuba.

After the nationalization, the Tabacalera plant continued to manufacture cigars, and continued to use the names "H. de Cabanas y Carbajal" and "Cabanas" on these products. Cuban Tobacco, however, was denied the right to control the standards of quality and characteristics of the cigars and to inspect and supervise the processes and methods of manufacture.

Some time after the nationalization, on March 15, 1961, Wood, who subsequently became president of plaintiff R.C.W., informed American importers of Cuban made cigars, by letter, that from that date forward all Cuban cigars were being sold through a Cuban government export organization, Empresa Cubana de Exportaciones, (Empresa), and that he, Wood, had been "asked," presumably by the Cuban government, "to act as coordinator for all orders and shipments to our market." The letter announced an agreement between Wood and Empresa which provided that all cigar shipments to this country from Cuba were to be billed to Wood and that he, in turn, would send invoices to American importers who ordered cigars through him.

In April of 1961 plaintiff R.C.W. was incorporated. Wood assigned his rights under the above described contract with Empresa to the new corporation and became its president. Wood contends that R.C.W. was organized solely for the purpose of coordinating and expediting the handling of orders for Cuban cigars and the processing of shipments of cigars from Cuba to the United States. In any event, when difficulties arose with various importers who cancelled orders for cigars ready for shipment, R.C.W. itself went into the business of importing and selling Cuban cigars in this country. Included in this business were cigars made at the Tabacalera plant and bearing the marks "Cabanas" and "H. de Cabanas y Carbajal." An undetermined number of the boxes in which these cigars were imported and sold bore the name "Cuban Tobacco Company" and the legend "Subsidiary of American Tobacco Company."

On May 23, 1961 some 47,650 "Cabanas" and "H. de Cabanas y Carbajal" cigars, were purchased by R.C.W. from Empresa and were flown by Pan American World Airways from Cuba to Miami, Florida. The cigars were then transported in bond by truck to New York where they were placed in a bonded warehouse operated by Towers' Warehouses, Inc. On June 2, 1961, R.C.W., acting through its custom house brokers, tendered the duty due on 10,150 of these cigars and they were released to it under Entry Number 1,029,381 on that date.

About a week earlier, on May 25, 1961, Cuban Tobacco had applied to the United States Treasury Department for the recordation of the trademarks "Cabanas" and "H. de Cabanas y Carbajal" under 15 U.S.C. § 1124. These applications recited the registration of the marks by Cuban Tobacco and that the cigars "were previously manufactured in Cuba, but will hereafter be manufactured by the applicant in Trenton, New Jersey." The applications were accepted and the Commissioner of Customs, in furtherance of the recordation sent a directive, known as a Notice of Recordation, to all Collectors of Customs, Appraisers of Merchandise, and Regional and Senior Customs Representatives informing them that the marks had been recorded. The Notice of Recordation also alerted all customs authorities to the possibility that R.C.W. might attempt to import cigars which violated the recorded trademarks.

Then, on June 8, R.C.W., again acting through its custom-house brokers, tendered the duty due on the 37,500 cigars which were the remainder of the shipment of May 23, 1961, and requested their release. The Collector of Customs,[4]

4. At that date Farrelly and not Dill as named in the complaint was Collector of Customs. Dill resigned as Collector of Customs of the Port of New York on June 9, 1961. Farrelly served as Acting Collector of Customs during the interim between Dill's resignation and the appointment of Joseph Kelly as Collector on July 5, 1961. The complaint was filed during this period, on June 29, 1961. The government has asked that this defect be corrected by dropping Dill's name from the complaint so as to have the defendant Collector of Customs referred to by title only. There has been no objection made to this suggested procedure and in in the interest of avoiding further complicating an already difficult matter that request will be granted.

however, having by then received the Notice of Recordation, declined to accept the duty and turn over the cigars on the ground that they violated Cuban Tobacco's registered and recorded trademarks. These cigars are still being held at the bonded warehouse and they are the only cigars presently in this country which are the subject of this litigation.[5]

Against this background I turn first to plaintiff's motion. It is plaintiff's position, on the facts presently before the court, that a question exists as to whether Cuban Tobacco owns these trademarks, and that, under such circumstances, it is entitled to an injunction pendente lite restraining the enforcement of the recordation. Plaintiff contends that such an injunction will return the parties to their original positions and permit the issues in this law suit to be litigated without damage to either party. It asserts that the recordation of the trademarks is in effect an ex parte injunction issued without any of the safeguards which a judicial proceeding would have provided and, therefore, "upon a minimal showing that it was improperly issued," its enforcement should be enjoined by this court.

This is not the appropriate standard by which to determine plaintiff's right to injunctive relief.

Section 7 of the Lanham Act provides that the registration of a trademark is prima facie evidence both of the trademark's validity and of the ownership of the mark. This section has been interpreted to mean "not only that the burden of going forward is upon the contestant of the registration but that there is a strong presumption of validity so that the party claiming invalidity has the burden of proof and in order to prevail it must put something more into the scales than the registrant." Aluminum Fabricating Company of Pittsburgh v. Season-All

Window Corp., 259 F.2d 314, 316 (2 Cir. 1958). See also Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538 (2 Cir. 1956).

Only trademarks which have been properly registered may be recorded under § 42 of the Act. The recordation and the consequences which stem from it plainly rest then not only upon the representations made by the applicant but also upon the registration of the mark itself and the presumptions that flow from such registration. Thus the recordation may hardly be said to be as insecurely based as plaintiff claims here.

■ Recordation is a remedy which Congress deemed appropriate in order to protect domestic manufacturers against encroachment upon their trademarks and to protect the public from the imposition of imported articles assuming domestic names. See 24 Op.Att.Gen. 551 (1902). A recordation may be attacked by motion for preliminary relief only upon a showing by the moving party that there was no justification for its issuance on the facts of the case. Richard J. Spitz, Inc. v. Dill, 140 F.Supp. 947 (S.D.N.Y.1956).

■ The "minimal showing" which plaintiff has urged upon the court in the case at bar, is, therefore, altogether inappropriate. Plaintiff must sustain the traditional burden of a party moving for preliminary injunctive relief in order to succeed on its motion. Included in that burden is the obligation of establishing to the satisfaction of the court the probability of success on the trial. See Speedry Products, Inc. v. Dri Mark Products, Inc., 271 F.2d 646 (2 Cir. 1959); Chas. D. Briddell, Inc. v. Alglobe Trading Corp., 194 F.2d 416 (2 Cir. 1952); Gillette Company v. Ed Pinaud, Inc., 178 F.Supp. 618 (S.D.N.Y.1959).

I turn then to the substance of plaintiff's claim. It is its position that Cuban Tobacco was not entitled to have the

5. It should be noted that on June 16, 1961 the Collector of Customs wrote R.C.W.'s customhouse broker directing him to hold the 10,150 cigars which had been released on June 2nd "pending the release of the merchandise." However, since those cigars had been released prior to the recordation the Collector changed his position with reference to them. They were released and are of no concern here.

trademarks "Cabanas" and "H. de Cabanas y Carbajal" recorded because it never owned the marks and even if it did own them at one time, it has long since lost ownership by abandonment as that term is defined by § 45 of the Lanham Act.[6] Plaintiff also contends that even if Cuban Tobacco does own the marks it was not engaged in manufacturing or trading in the products so marked when it had them recorded and therefore did not meet the requirements of § 42 of the Act and was not entitled to the recordations.

## I.

■ There can be no doubt that ownership of a United States trademark can "exist only as an appurtenance to manufacturing or marketing business conducted in the United States in which mark is used." Rogers v. Ercona Camera Corporation, 107 U.S.App.D.C. 295, 277 F.2d 94, 97 (D.C.Cir. 1960) and cases there cited. See also Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S. Ct. 357, 60 L.Ed. 713 (1916). Here, while Cuban Tobacco commenced manufacturing cigars on which the marks were used in its Trenton, New Jersey, plant on July 7, 1961, it did not actually conduct any manufacturing or marketing business in which the marks were used for a considerable period prior to that time.

Cuban Tobacco contends that the fact that it did not itself carry on such business is of no significance on the present motion because .it and Tabacalera were "related companies" within the meaning of § 45 of the Lanham Act,[7] and therefore its ownership of the marks is protected by the provisions of § 5 of the Act.

Section 5 reads:

"Where a registered mark or a mark sought to be registered is or

may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public." (15 U.S.C. § 1055.)

R.C.W. counters the related companies theory advanced by Cuban Tobacco by arguing that: (1) Cuban Tobacco's predecessor De Cabanas exercised no control over the nature and quality of the cigars manufactured by Tabacalera from 1934 until 1951 and therefore any ownership rights that De Cabanas had in the marks had been long since abandoned by the time the "relationship" came into being; (2) the control provided for in the agreement of 1951 was never in fact exercised by De Cabanas or by Cuban Tobacco; and (3) by the time that the recordation was actually applied for, Tabacalera had been nationalized and was plainly no longer "related" to Cuban Tobacco.

There is nothing presently before the court which in any way indicates the nature of the relationship between Tabacalera and De Cabanas prior to 1951. Plaintiff speculates in its brief that the agreement signed in 1951 "seems to be an attempt to recreate a semblance of ownership in trademarks long lost by abandonment." However, it is equally probable that the agreement merely reduced to writing procedures which were practiced by the parties between 1934 and 1951.

■■ It is clear that the burden of proving abandonment is upon him who asserts it. Dawn Donut Company, Inc. v. Hart's Food Stores, Inc., 267 F.2d 358 (2 Cir. 1959); Friedman v. Sealy, Incor-

---

6. "A mark shall be deemed to be 'abandoned'—
 "(a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.
 "(b) When any course of conduct of the registrant, including acts of omission as well as commission, causes the

mark to lose its significance as an indication of origin." (15 U.S.C. § 1127.)

7. "The term 'related company' means any person who legitimately controls or is controlled by the registrant or applicant for registration in respect to the nature and quality of the goods or services in connection with which the mark is used." (15 U.S.C. § 1127.)

porated, 274 F.2d 255 (10 Cir. 1959). See also 3 Callman on Unfair Competition and Trade-Marks (2 ed. 1950), § 79.3 and cases there cited. Accordingly, plaintiff has the burden of proof on this issue. Here there is nothing but a bare allegation of abandonment during the period in question, without any facts to support it. There is nothing showing that plaintiff is likely to prevail ultimately on this question. In the light of the factual vacuum in this record then, plaintiff is not entitled to preliminary injunctive relief on the ground of abandonment prior to 1951.

Turning next to the period from 1951 to September of 1960, plaintiff contends that all the evidence points to the conclusion that Cuban Tobacco did nothing to exercise its rights to inspect, supervise and control the manufacture of cigars during that period. It presents as illustrations of the relationship between Cuban Tobacco and Tabacalera the fact that Cuban Tobacco had to write Tabacalera for information about the labels on its boxes, permitted Tabacalera to violate an anti-trust decree, and did not learn the details of Tabacalera's nationalization until some time after the fact. This, it says, is illustrative of a total lack of control.

On the other hand, the Secretary of Cuban Tobacco, Herman, states in his affidavit opposing the motion that "the manufacturing activities of Tabacalera, as a wholly-owned subsidiary, were under the direction and control of a management selected by Cuban, as sole stockholder, and acting under Cuban's supervision." In substance, he asserts that Cuban Tobacco affirmatively exercised the rights of De Cabanas under the 1951 contract with Tabacalera which Cuban Tobacco had acquired by assignment from De Cabanas.

■ Under § 5 of the Lanham Act it is clear that controlled licensing does not constitute an abandonment of the licensor's registration of a trademark. Dawn Donut Company, Inc. v. Hart's Food Stores, Inc., supra; Alligator Company v. Robert Bruce, Inc., 176 F.Supp. 377 (E.D.Pa.1959); Arthur Murray, Inc. v. Horst, 110 F.Supp. 678 (D.Mass.1953). See also 4 Callman on Unfair Competition and Trade-Marks (2 ed. 1950) § 98.3(c). Naked licensing, that is to say, licensing without the exercise of supervision by the licensor, on the other hand, may constitute an abandonment. Dawn Donut Company, Inc. v. Hart's Food Stores, Inc., supra; Alligator Company v. Robert Bruce, Inc., supra; Arthur Murray, Inc. v. Horst, supra. The reason for the distinction is that the risk that the public will be deceived is minimized and the purpose of the Act is therefore effectuated when the licensor exercises supervision and control over the operations of its licensees. See Sen. Report No. 1333, 79th Cong., 2d Sess. (1946), U.S. Code Cong. Service 1946, p. 1274 et seq.

■ The crucial question when the relationship between two companies is questioned as it is here, is, therefore, "whether the plaintiff sufficiently policed and inspected its licensees' operations to guarantee the quality of the products they sold under its trademarks to the public." Dawn Donut Company, Inc. v. Hart's Food Stores, Inc., supra, 267 F.2d p. 367. This is a question of fact, upon which the language of the agreement between the parties is not necessarily decisive, and on which the party seeking to prove abandonment must bear the burden of proof. See Dawn Donut Company, Inc. v. Hart's Food Stores, Inc., supra; Alligator Company v. Robert Bruce, Inc., supra; and Arthur Murray, Inc. v. Horst, supra.

Viewed in this light it is clear that here again plaintiff has not come forward with sufficient to justify the granting of a preliminary injunction. Bare allegations without more are wholly insufficient to establish facts necessary to sustain its burden.

Plaintiff, at this point in the litigation, appears to have no information about the nature of the relationship between Cuban Tobacco and Tabacalera during the period in question. On the other hand, the secretary of Cuban Tobacco is plainly in a position to know about this

relationship. As I have indicated, his affidavit states unequivocally that, in fact, Tabacalera's manufacturing activities were carried on by a management chosen by Cuban Tobacco, and acting under its direction and control and that such activities were being performed under Cuban Tobacco's supervision. Whether plaintiff will be able to refute this on trial, of course, remains to be determined. However, it plainly has not sustained its burden upon this motion.

■ Finally, plaintiff's contention that since the recordation took place after Tabacalera had been nationalized, the related companies doctrine cannot save Cuban Tobacco's trademark, must also be rejected. The fact that several months elapsed between the time that the facilities of Cuban Tobacco's wholly owned subsidiary were suddenly nationalized and the date on which it commenced manufacturing the cigars itself does not establish abandonment. There must also have been an intention not to resume the use of the marks. See Huber Baking Company v. Stroehmann Brothers Company, 252 F.2d 945 (2 Cir. 1958), cert. den. 358 U.S. 829, 79 S.Ct. 50, 3 L. Ed.2d 69 (1958); Consolidated Cosmetics v. Neilson Chemical Co., 109 F.Supp. 300 (E.D.Mich.1952). Quite apart from the relatively short time interval and the unique situation with which Cuban Tobacco was faced, there is no indication that it had any such intent here. All indications are to the contrary. Plaintiff is clearly not entitled to preliminary injunctive relief based on lack of ownership of the trademarks at the time of the recordation.

## II.

Plaintiff's second basic substantive contention is that even if Cuban Tobacco is deemed to have retained an ownership interest in the marks as a result of the related company doctrine, it nevertheless was still not a "manufacturer or trader" at the time of the recordation as required by § 42 of the Lanham Act. Plaintiff urges that under these circumstances recordation was improper regardless of who owned the trademarks.

I do not agree.

Section 5 of the Lanham Act, the related company section, provides that the use to which one related company puts a trademark "shall inure to the benefit of the registrant." Plainly then, if Tabacalera and Cuban Tobacco were related companies, (and I cannot conclude that they were not on the basis of the papers now before me), the manufacturing activities in which Tabacalera was engaged inured to the benefit of Cuban Tobacco.

Moreover, if the language of § 5 is to be given any real and purposeful meaning, it must be viewed as allowing a related company, to whose benefit manufacturing activities inure under the section to be included in the term "manufacturer" as it is used in § 42. Such a related company, which in essence retains its ownership of the trademark as the result of its close relationship with the manufacturing activities, may therefore have the trademark protected by a recordation.

Under the interpretation of § 42 which plaintiff advances, a related company owner would be excluded from the benefits of recordation. This would run counter to the plain meaning of the broad language used by Congress in § 5 in defining the rights of related companies and would thwart the purposes of the Act which were to protect all those legitimately entitled to the use of a registered mark.

■ I therefore conclude that unless it be established that Cuban Tobacco and Tabacalera were not related companies, plaintiff is not entitled to relief from the recordation on the theory that § 42 of the Lanham Act did not apply.

The fact that the actual recordation took place during that relatively short period between the nationalization of Tabacalera and the commencement of manufacturing activities by Cuban Tobacco in this country does not alter this conclusion. There is no showing that Cuban Tobacco lost its rights to the marks during this interim period.

Plaintiff's motion for a preliminary injunction is denied in all respects.

### III.

I turn finally to the cross-motion of Cuban Tobacco for a preliminary injunction against R.C.W. Cuban Tobacco seeks to have plaintiff restrained from importing or distributing here cigars bearing the trademarks in question and from using defendant Cuban Tobacco's corporate name in connection with this business.

Plaintiff has stated, by its counsel, that upon determining that some of the boxes of cigars which had been released still bore Cuban Tobacco's name it immediately took the requisite steps to correct this situation. In view of the representation to the court that this difficulty has been effectively dealt with, and absent any showing by Cuban Tobacco that the steps taken were not effective, I see no reason for granting injunctive relief on this ground.

With reference to the other phase of defendants' motion, it is clear that as a practical matter the only cigars now in this country with which this case is concerned are those currently held in the bonded government warehouse. By denying plaintiff's motion I have refused to direct their release.

There remains the question of possible harm to Cuban Tobacco arising from future shipments of cigars from Cuba bearing the marks in dispute. Such contingency appears to be adequately taken care of by the proclamation on February 3, 1962 by the President of the United States, acting pursuant to § 620(a) of the Foreign Assistance Act of 1961, 22 U.S.C. § 2370, of an embargo on all trade with Cuba (27 Fed. Register 1085). The effect of this embargo, among other things, is to bar entry into this country of all Cuban tobacco products.

Cuban Tobacco is fully protected by the denial of plaintiff's motion and by the Presidential embargo of February 3rd. Under these circumstances there is no showing of probable irreparable harm to Cuban Tobacco as required by Rule 65, F.R.Civ.P. Quite apart from the disputed questions of fact previously discussed, preliminary injunctive relief is therefore not appropriate. The denial of such relief under these circumstances is of course without prejudice to a renewal of Cuban Tobacco's application if new considerations should arise which make irreparable harm imminent. But until such an occasion arises there is no need to pass on its motion on the merits.

The motion of plaintiff R.C.W. and the cross-motion of defendant Cuban Tobacco are therefore both denied in all respects.

It is so ordered.