**A. T. CROSS COMPANY, Plaintiff,**

v.

**JONATHAN BRADLEY PENS,**
**Inc., et al, Defendants.**

Civ. No. 72 4266.

United States District Court,
S. D. New York.

Oct. 25, 1972.

Watson, Leavenworth, Kelton & Taggart, New York City, for plaintiff; Leslie D. Taggart, New York City, of counsel.

Milgrim, Tomajan & Jacobs, New York City, for defendants; Raymond J. Hagan, New York City, of counsel.

ROBERT L. CARTER, District Judge.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is an action for trademark infringement and unfair competition. Plaintiff properly places reliance on the Trademark Act of 1946 as amended, 15 U.S.C. § 1051 et seq. and 28 U.S.C. § 1338. There is also diversity of citizenship and the requisite jurisdictional amount of $10,000. Plaintiff seeks a preliminary injunction pending trial on the merits. The factual setting in which the controversy arose was developed by way of affidavits submitted by both sides and in testimony and documentary evidence introduced at a hearing on the motion.

Plaintiff, A. T. Cross Company, is a Rhode Island corporation. It has been in the business of manufacturing, advertising, offering for sale, selling and distributing mechanical pens and pencils bearing its trademark "Cross" since 1868. Its mark covering mechanical pencils was registered before 1950, and it has been selling ballpoint pens under this mark since 1953, although registration of the mark to cover ballpoint pens did not take place until 1971. In addition plaintiff has registered its mark in a number of foreign countries.

Plaintiff engages in both the retail and specialty trade, the latter being distributors and industrial concerns that buy pens and pencils in large quantity for use by the agency or company personnel or for distribution as gifts. The usual practice is for the agency, company or distributor's name to be put on these pens. The pens and pencils which plaintiff sells in the specialty trade bear its mark in addition to whatever agency company or distributor's emblem is eventually attached to them.

Plaintiff has two basic products: a gold filled pen and pencil set that retails for $17.00 and a silver pen and pencil set that retails for $10.00. Its gross sales in the United States in 1971 was fifteen million dollars ($15,000,000.00), of which twenty percent (20%), or three million dollars ($3,000,000.00) was in the specialty trade. Plaintiff has seen its greatest growth occur within the last five years, with annual gross sales rising from nearly ten million dollars ($10,000,000.00) in 1967 to over

twenty million dollars ($20,000,000.00) in 1971. Correspondingly, its annual expenditures for advertising and promotion of its products in national magazines, newspapers, trade publications and television have steadily increased, peaking to eight hundred thousand dollars ($800,000.00) in 1971.

Defendant, Jonathan Bradley Pens, Inc., is a New York corporation. It has been in the business of manufacturing, offering for sale, selling and distributing ballpoint pens and pencils since the take over of its predecessor, Morgan Henley Pens, Inc., in 1969 [1] which began operating in 1968. Morgan Henley had given the name "LaCrosse" to one of its products. The then president of Morgan Henley, now an officer of the defendant corporation, testified that although he had heard of the plaintiff company before naming the pen LaCrosse, his inspiration for the name had come from the game Lacrosse. As used by Morgan Henley it was spelled as one word with the "c" capitalized: LaCrosse.

When defendants, Jerome Salinger and Thomas Du Bois, took over Morgan Henley and organized the defendant corporation, they continued to sell pen and pencil sets under the name La Crosse. The spelling was changed, however, to two words so that the name became "La Crosse" which is the current spelling and usage by defendants.

Jonathan Bradley markets its products to the specialty trade exclusively. It does not advertise in national magazines, newspapers, trade publications or on television. It promotes its products by distributing its catalog and promotional literature to wholesalers through the mails and at trade shows of the Advertising Specialty Trade Association. It also displays its merchandise at these trade shows. Defendant has customers both in the United States and abroad who order La Crosse pen and pencil sets.

Although Jonathan Bradley uses several names for its various products, the most frequent being "Astromatic," "Astropoint" and "La Crosse," it has sought to register "Astropoint" only. The "Astromatic" and "La Crosse" pens are inexpensive, selling at about the same price. "Astropoint" is more costly and resembles neither of the two less expensive pens. Except when samples are sent out to prospective buyers, none of these names are embossed on the pen itself. The names "La Crosse by Bradley" or "Astropoint by Bradley" appear only on the inside lining of the box in which the pen and pencil are packaged. Although the record is not altogether clear in this regard, my impression is that within the last six months, defendants have been putting the name "Astropoint" directly on the pens and pencils bearing that name. Defendants' catalog carries pictures of the various pens it manufactures, and in the catalog they are identified by name and number. Defendants' customers order by name and/or number, but defendants' normal practice in filling the orders is to refer on their invoice only to the catalog number. The La Crosse pen, in addition, is ordered under the name Crosset.

In promotional literature introduced at the hearing, defendants describe the La Crosse pen and pencil set as "Matching Gold Pen and Pencil Set with the look of simplicity. Inexpensive but looks like the high priced model." On the back of this piece of literature is the following: "The new La Crosse set. Sounds and looks like a more expensive set." It was also brought out at the hearing that defendants distribute and sell pens with "Chanel #5" and "Arpege" printed on them, that they have not secured permission from the owners to use these marks, and have not advised the owners of defendants' use.

■■ Since determination of a controversy involving trademark infringe-

---

[1]. Paragraph 2 of the affidavit of the defendant, Jerome Salinger seems to state that Jonathan Bradley acquired its predecessor, Morgan Henley in 1970. Subsequently in the affidavit and in oral testimony at the hearing the year 1969 was given as the year of acquisition.

ment and unfair competition necessarily turns upon its own particular facts, courts have recognized that prior decisions are not helpful except to show a general pattern. LaTouraine Coffee Co., Inc. v. Lorraine Coffee Co., 157 F.2d 115, 117 (2d Cir. 1946). The decisional law, however, has established various relevant factors which should be weighed in reaching a decision. Among these are the strength of the mark, the degree of similarity between the marks in question, the likelihood of confusion, the intent of the alleged infringer to palm off his product as those of another, the area and manner of concurrent use, the degree of care likely to be exercised by purchasers, and the likelihood of success at trial, Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 543 (2d Cir. 1956); J. R. Wood & Sons, Inc. v. Reese Jewelry Corp., 278 F.2d 157 (2d Cir. 1960).

█ The validity of plaintiff's mark and its long and extended use are not matters of dispute. Whether classified as weak or strong, plaintiff's mark would seem to qualify for protection. Weak marks are generally generic or descriptive, see W. E. Basset Co. v. Revlon, Inc., 435 F.2d 656, 661 (2d Cir. 1970), and where "because of association with a particular product or firm over a period of time a word has come to stand in the minds of the public as a name or identification for that product," Safeway Stores, Inc. v. Safeway Properties, Inc., 307 F.2d 495, 499 (2d Cir. 1962), that word, although a weak mark, is entitled to protection against unwarranted use by strangers.

Cross could be classified either way. It is a common name, and certainly if used in connection with the sale or distribution of religious articles, could be regarded as merely descriptive. As applied to plaintiff's product, however, the mark is fanciful and arbitrary. This issue seems altogether academic however, since, through advertising and promotion of its product, Cross has become publicly known and identified with plaintiff's product and has therefore ac-

quired a secondary meaning within the purview of the decisional law.

█ The similarity between Cross and La Crosse is evident. Both plaintiff and defendants are competing in the same market—the advertising specialty trade. Although the bulk of plaintiff's business is retail trade, its three million dollar ($3,000,000.00) sales in the specialty trade market where defendant operates exclusively is significant. This market must be presumed to consist of careful and sophisticated buyers. They buy in large quantity and spend large amounts of money for the purchase of pens. Ultimately however, the pens reach individual users. While all Cross pens sold on this market have Cross on the pen itself, an individual receiving a La Crosse pen is not likely to keep the box and might believe that what he has is truly a Cross product. The likelihood of confusion of La Crosse with Cross by individual users, who are the bulk of plaintiff's market, could work to the detriment of the Cross reputation. Such careless customer confusion cannot be dismissed, particularly since retail sales are the substance of plaintiff's business. See, e. g., Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-Le Coultre Watches, Inc., 221 F.2d 464, 466 (2d Cir.), cert. denied, 350 U.S. 832, 76 S.Ct. 67, 100 L.Ed. 743 (1955).

█ Obviously, defendants have the right to sell gold filled ballpoint pen and pencil sets, but it has the duty to so name and dress its product as to avoid, rather than promote, customer confusion. See Harold F. Ritchie, Inc. v. Chesebrough-Ponds, Inc., 281 F.2d 755, 758 (2d Cir. 1960). Indeed, the marks Astropoint and Astromatic, which defendants are using and which have no similarity in sound to plaintiff's mark appear to offer the defendant corporation an avenue for promotion which would not bring it into conflict with plaintiff.

The evidence thus far adduced makes clear that defendants use of "La Crosse" as a mark is a deliberate attempt to pro-

mote sales of its product by capitalizing on the plaintiff's reputation. As indicated, defendants make unauthorized use of the mark Chanel #5 and Arpege as well. However innocent and unconnected with plaintiff's product may have been the origin of LaCrosse in 1968, the current policy of the defendant corporation is to make profitable use of the similarity between the sound La Crosse and the sight of the pens and pencils so named with plaintiff's product.

The intent may not be to "palm off" on its own presumably sophisticated customers its La Crosse sets as plaintiff's product. Indeed, the promotional literature describing La Crosse pens as sounding and looking like "the high priced model" or as looking like "a more expensive set" admits inferentially that its La Crosse product is not the Cross pen and pencil set. The defendants are suggesting to their customers however that they might buy the cheaper pens, and thereby acquire the prestige to be gained by distributing for use to their employees, or as gifts, pens which the recipients might regard as plaintiff's more prestigious product. In short, defendants are telling their customers that they need not deal with plaintiff's more expensive merchandise, since La Crosse looks and sounds like the real thing. See, Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-Le Coultre Watches, Inc., *supra* 221 F.2d at 466.

■ The present officers of the defendant corporation have had extensive experience in the pen and pencil business. Indeed, defendant Jerome Salinger, worked in Providence, Rhode Island, the domicile of the plaintiff company and thus had knowledge of the existence and reputation of the plaintiff. Subjective intent is not crucial, standing alone, but must be considered along with all the other relevant factors. Maternally Yours, Inc. v. Your Maternity Shop, Inc., *supra* 234 F.2d at 543, and under the circumstances revealed by the present status of this record it cannot be ignored.

■ There has been no evidence of actual damage to plaintiff. Indeed, the record shows that plaintiff has enjoyed unprecedented prosperity and popularity during the four and one-half year period since defendants began using the mark La Crosse. A showing of actual damages, however, is not necessary for plaintiff to establish a right to relief by way of preliminary injunction. "[C]onfusing similarity between marks is sufficient injury" to entitle plaintiff to injunctive relief. P. Daussa Corp. v. Sutton Cosmetics (P.R.) Inc., 462 F.2d 134, 136 (2d Cir. 1972).

■ Plaintiff has not sought relief until this action, some four and one-half years after use of the name first began. It is clear, of course, that "a party cannot invoke the stringent remedy of preliminary injunction who has been guilty of long and unexcused laches in asserting his rights." Edward & John Burke, Ltd. v. Bishop, 144 F. 838, 839 (2d Cir. 1906). Certainly a party who sleeps on his rights evidences no need for the urgent and speedy relief which a preliminary injunction affords. See Gillette Co. v. Ed Pinaud, Inc., 178 F.Supp. 618, 622 (S.D.N.Y.1959).

■ Yet time alone cannot be the sole determinant in deciding whether an injured party has been guilty of laches. When an infringement is carried on in virtual secrecy over a period of time and is not discovered until some years later, the injured party who takes immediate action to assert his rights once he learns of the infraction cannot be said to have slept on his rights. Such is the case here.

The defendants confine their promotion, distribution and sale to the specialty trade. The 1969 catalog has a picture of a pen described as "The La-Crosse TP 80 C" and on the same page a picture of a pen and pencil set described as "The LaCrosse Duo TP 80–2." This is the year defendants took over Morgan Henley and the spelling of LaCrosse is in accord with the Morgan Henley practice. The only reference in the 1970

catalog to LaCrosse occurs on page 2 (again the spelling is one word) which states "TP 80 CP Pencil matched to the LaCrosse pen—available in chrome only." One would have to look very carefully at the 1970 catalog to even notice the name LaCrosse. The 1971 catalog has a prominent picture display of a pen and pencil set in an open box bearing the inscription "La Crosse by Bradley." The evidence produced shows that defendants bought 5150 of these boxes in 1970, 4928 in 1971 and 10,205 thus far in 1972. Thus, they seem to be preparing for a big drive in 1972 to promote the La Crosse sets.

Defendants testified that they displayed their products at trade shows of the specialty trade. The president of the plaintiff company testified that he attended one or two of these specialty trade shows each year and may have visited defendants' booth, but he never saw any reference to La Crosse. Plaintiff has put in the record a listing of some nine cases (five in this Court, one in Ohio, two in Rhode Island and one in Louisiana) in which it has been or is involved as a plaintiff in trademark infringement litigation. It is hard to believe that plaintiff would have willingly and knowingly acquiesced in defendants' use of La Crosse for four and one-half years.

The explanation appears to lie in defendants' limited visibility until now, and it cannot be said that plaintiff should have known of the infringement before they actually learned of it a day before commencement of this action. This year however, defendants were preparing to use the name La Crosse more widely and openly than ever before, which is undoubtedly the reason plaintiff learned for the first time what they were doing.

Even conceding arguendo that the defendants operated on a very restricted scale for several years; that although aware of what they were doing, plaintiff chose to ignore them; and that this year they decided upon a greatly expanded operation, plaintiff would still be entitled to relief. Miss Universe, Inc. v. Patricelli, 271 F.Supp. 104, 110 (D. Conn.1967), aff'd., 386 F.2d 999 (2d Cir. 1967), where the court stated:

"The doctrine of laches is inapposite in this case where the evidence makes plain a history of slow encroachment upon plaintiff's preserve, of increasingly direct competition, and of sudden promotional expansion aimed at exploitation of a market created by plaintiff."

It has traditionally been held that a preliminary injunction will issue only if there is "a clear likelihood of success on the merits." Sutton Cosmetics (PR) v. Lander Co., 455 F.2d 285 (2d Cir. 1972). This standard has not been applied in this case. The "likelihood of success" standard requires of the trial judge a prejudgment of the substantive merits of the case based only on the evidence presented pursuant to the motion for preliminary relief. The Court is thus cast in the role of prophet as to what is likely to be revealed at trial.

In the past the "clear likelihood of success" formula may not have had pernicious consequences because the judge who issued the preliminary injunction would often not be the same judge hearing the case on the merits. Thus the prejudgment of the first judge would not necessarily be the impressions of the ultimate trier of fact. Recently, however, due to a change in the assignment system in this Court, it is virtually certain that the same Court will decide both the propriety of preliminary relief *and* the merits of the case. Under these circumstances, to apply the "clear likelihood of success" standard requiring a prejudgment of the issues not only gives the appearance of judicial impropriety but also forces the Court to abandon the ideal of disinterested openmindedness until all the evidence is presented. Human nature being what it is, the Court would prefer to avoid any possibility of becoming attached to a conclusion based on less than all the testimony, evidence

and arguments the parties feel relevant and pertinent to their interest.

In granting the motion for a preliminary injunction I can only say that on the basis of evidence thus far presented a *prima facie* case of infringement has been made and no countervailing defense has been established. Plaintiff is therefore entitled to protection until the trial on the merits is complete. It would appear to me that any further prejudgment of the issues on my part would entitle the defendants to a trial before another judge.

At the trial, which is being expedited for reasons to follow, plaintiff's current advantage may be dissipated. Therefore the determination on the merits cannot be predicted with any degree of certainty at this time. What is presently clear is that defendants should not be permitted to continue to infringe plaintiff's trademark on the basis of the present record.

Defendants argue (and persuasively in another context) that the preliminary injunction should not issue now during what they describe as the busiest season of the year since plaintiff will thereby succeed in putting defendants out of business without trial, a result, they argue, which probably would not be accomplished at trial. While not convinced that plaintiff should be denied injunctive relief to which they seem clearly entitled because defendants may lose considerable business, I am persuaded that the trial on the merits and final determination ought to be expedited in order to avoid the effect which defendants fear. The matter is therefore set down for trial on the merits on November 1, 1972. The parties may incorporate the evidence introduced at the hearing on the preliminary injunction into the record of the trial.

Preliminary injunction is granted pending final determination on the merits barring defendants from using the name La Crosse or Crosset in any catalog, advertising, literature, sale or display, on any pens or pencils, or on or in any boxes in which their pens or pencils are sold, shipped, displayed or distributed, or on any of the pens or pencils which defendants manufacture, offer for sale, distribute or sell. Plaintiff is ordered to post a bond of $25,000.00 pending final judgment. Settle order.