**CUBAN CIGAR BRANDS N. V., Plaintiff,**

v.

**UPMANN INTERNATIONAL, INC., Defendant.**

No. 77 Civ. 345.

United States District Court, S. D. New York.

July 20, 1978.

Watson, Leavenworth, Kelton & Taggart, New York City, for plaintiff; Frank J. Colucci, Leslie D. Taggart, Howard B. Barnaby, Jr., William R. Liberman, New York City, of counsel.

Bader & Bader, New York City, for defendant; I. Walton Bader, New York City, of counsel.

## OPINION FINDINGS OF FACT AND CONCLUSIONS OF LAW

WEINFELD, District Judge.

This trademark infringement action involves variations on the name "Upmann" as a mark used in the sale of cigars.[1] Plaintiff, owner of the mark "H. Upmann," seeks declaratory and injunctive relief under the Lanham Act[2] and the common law: (a) cancelling defendant's federal registration of the marks "Carl Upmann" and "Upmann's Repeater" and (b) enjoining defendant's further use of these marks, the name "Upmann" alone as a mark, and its recently

---

1. Jurisdiction is founded upon 28 U.S.C. §§ 1332, 1338.

2. 15 U.S.C. §§ 1051 *et seq.*

adopted corporate name, "Upmann, International, Inc." Interposing various defenses such as laches, abandonment and the incontestability of its marks, defendant seeks to dismiss the complaint and requests a declaratory judgment permitting it to use its marks without interference. Defendant also counterclaims, alleging that plaintiff had committed various antitrust and United States tax law violations which require cancellation of plaintiff's mark and an award of treble damages in its favor. The antitrust and tax law claims, for which defendant demanded a trial by jury, were severed from the trademark issues which were tried to the Court.

At the close of a two-day trial, the Court indicated that there was no question but that there was "likelihood of confusion" under the Lanham Act[3] and cases construing it.[4] Plaintiff was thus entitled to the injunctive relief sought, unless one of the defendant's defenses could be sustained—specifically, whether plaintiff was guilty of laches[5] and whether the defendant's use of Upmann in its marks was in bad faith so as to preclude its asserting that defense. Answering the first question negatively and the second affirmatively, the Court grants plaintiff its requested relief.

## I

### A. The Parties, Individually

Simply stated, H. Upmanns manufactured in pre-Castro Cuba were among the world's finest cigars. First registered in this country on December 17, 1912 to H. Upmann & Co. of Havana, Cuba (Registration No. 89,518),[6] the mark and business were acquired by Menendez, Garcia y Compania ("Menendez Garcia"), a Cuban limited liability partnership,[7] on or about August 2, 1939. Although its reputation even then was that of a fine, expensive, hand-made cigar, its sales volume was not commensurate with its reputation, and Menendez Garcia sought to change that situation.

Their efforts met with great success. By 1959, H. Upmann had garnered nearly 80% of the premium cigar market in Cuba and by volume was the largest brand exported. Packaged in attractive cedar boxes, espe-

---

**3.** Section 32 of the Lanham Act, 15 U.S.C. § 1114(1).

**4.** *See, e. g., Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1336 (2d Cir. 1975); *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.*, 411 F.2d 1097, 1099 (2d Cir. 1969), *cert. dismissed*, 396 U.S. 1054, 90 S.Ct. 707, 24 L.Ed.2d 698 (1970); *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 441 F.Supp. 1220, 1225 (S.D.N.Y.1977), *aff'd*, 580 F.2d 44 (2d Cir. 1978); *Stix Prods., Inc. v. United Merchants & Mfrs., Inc.*, 295 F.Supp. 479, 486 (S.D.N.Y.1968).

Indeed, despite its contention at trial that the marks are not confusingly similar, defendant had earlier argued precisely the opposite. In a petition to cancel plaintiff's mark filed prior to the commencement of this action, *see* text accompanying notes 14 and 40 *infra*, defendant swore that the registration (other than its own) of a mark "bearing the word UPMANN constitutes a cloud on" its title and that "on information and belief, the words CARL UPMANN and H. UPMANN utilized on identical goods are confusingly similar to one another." At trial, defendant offered no convincing explanation for these inconsistent positions.

**5.** It is clear from both the statute and the cases that laches is a defense even where a mark is incontestable under 15 U.S.C. § 1065. *See* 15

U.S.C. § 1116 (Court has power "to grant injunctions, according to the principles of equity"); *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44 (5th Cir. 1975); *John Wright, Inc. v. Casper Corp.*, 419 F.Supp. 292 (E.D.Pa.1976); *Haviland & Co. v. Johann Haviland China Corp.*, 269 F.Supp. 928 (S.D.N.Y.1967); *Polaroid Corp. v. Polarad Elec. Corp.*, 182 F.Supp. 350 (E.D.N.Y. 1960), *aff'd*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

**6.** The registration was renewed on December 17, 1952, and was republished on February 9, 1954; and combined affidavits under sections 8 and 15 of the Lanham Act, 15 U.S.C. §§ 1058, 1065, were filed on April 22, 1959. The registration was most recently renewed on December 17, 1972 and is presently outstanding and uncancelled.

**7.** As noted in a prior case involving plaintiff's assignor, a Cuban limited liability partnership is "an entity unfamiliar to American law." *F. Palicio y Compania, S. A. v. Brush*, 256 F.Supp. 481, 483 (S.D.N.Y.1966), *aff'd*, 375 F.2d 1011 (2d Cir.), *cert. denied*, 389 U.S. 830, 88 S.Ct. 95, 19 L.Ed.2d 88 (1967). Unless otherwise required by the text, reference to plaintiff in this opinion shall be deemed to include its predecessors.

cially for luxury store distribution, H. Upmanns were sold throughout the United States by leading cigar importers and distributors as a premium product. Menendez Garcia spent about $50,000-$70,000 per year on direct advertising which appeared in magazines such as the *New Yorker* and *Fortune* and in the financial press; the American importers also advertised in their catalogues and with the news media. In its last full year of business in Cuba, Menendez Garcia exported to this country more than five million cigars at a wholesale price in excess of one and one-half million dollars; the cigars were then sold for between 50¢ and $1.25 per cigar, according to grade.

In 1960, the Menendez Garcia organization was intervened (in effect, confiscated) by the Castro government.[8] The principals, joined by a number of their skilled employees, fled Cuba for Spain and, in Las Palmas, Canary Islands, formed Compania Insular Tabacalera ("CIT"), along with investors including some of those previously interested in Menendez Garcia and a number of new, additional interests. For a while, they continued to manufacture cigars with Cuban-grown tobacco, but after the United States embargo on Cuban goods took effect,[9] CIT began to experiment with blends of Santo Domingo, Brazil, Cameroon, Sumatra and Connecticut tobacco. These cigars were sold under trademarks other than H. Upmann, in part because of ongoing litigation concerning ownership of the mark with various importers and the Cuban government,[10] which, following its intervention, continued to export cigars under the H. Upmann name. CIT, however, continued to test various blends, in an effort to market a non-Cuban tobacco cigar of equally high quality as the Cuban version under the name H. Upmann once the ownership issue was resolved. Although there were various shipments of non-Cuban H. Upmanns made prior to 1975, these were *de minimis* and were made for the sole purpose of testing various blends. In November 1975, however, having emerged victorious on the ownership issue, thus entitled to the exclusive right to use H. Upmann,[11] and having developed a satisfactory blend of non-Cuban H. Upmann cigars, CIT began shipments in earnest. The return of H. Upmann to the American market was greeted with great acclaim in the press and renewed consumer acceptance.

Plaintiff acquired the business, the H. Upmann mark, as well as another former Menendez Garcia brand in 1976, for which it paid $1,000,000, although CIT continues manufacturing. Since plaintiff's acquisition, sales have been at the rate of approximately 300,000 per month; the retail prices are twice what they were in 1959. Plaintiff continues to advertise through television, magazines and newspapers, and distributors likewise continue to promote the product. Having successfully passed through rebirth, H. Upmann now enjoys the revival of its reputation as one of the premium cigars sold in this country.

Defendant's tale is rather less illustrious. The earliest use for which any evidence was offered at trial was the early 1930's, although the applications filed in 1954 for

8. Among the various reported litigations relating to the Cuban intervention of the cigar industry are *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976); *Garcia v. Montecrispi Cigar Co.*, 409 F.2d 14 (5th Cir. 1969); *Menendez v. Faber, Coe & Gregg, Inc.*, 345 F.Supp. 527 (S.D.N.Y.1972), aff'd sub nom. *Menendez v. Saks & Co.*, 485 F.2d 1355 (2d Cir. 1973), cert. denied, 425 U.S. 991, 96 S.Ct. 2201, 48 L.Ed.2d 815 (1976); *F. Palicio y Compania, S. A. v. Brush*, 256 F.Supp. 481 (S.D.N.Y.1966), aff'd, 375 F.2d 1011 (2d Cir.), cert. denied, 389 U.S. 830, 88 S.Ct. 95, 19 L.Ed.2d 88 (1967); *R. C. W., Supervisor, Inc. v. Cuban Tobacco Co.*, 220 F.Supp. 453 (S.D.N.Y.1963).

9. *See* Presidential Proclamation No. 3447, 27 Fed.Reg. 1085 (1962).

10. *E. g., Menendez v. Faber, Coe & Gregg, Inc.*, 345 F.Supp. 527 (S.D.N.Y.1972), aff'd sub nom. *Menendez v. Saks & Co.*, 485 F.2d 1355 (2d Cir. 1973), cert. denied, 425 U.S. 991, 96 S.Ct. 2201, 48 L.Ed.2d 815 (1976); *F. Palicio y Compania, S. A. v. Brush*, 256 F.Supp. 481 (S.D.N.Y.1966), aff'd, 375 F.2d 1011 (2d Cir.), cert. denied, 389 U.S. 830, 88 S.Ct. 95, 19 L.Ed.2d 88 (1967).

11. *See* cases cited in note 10 *supra*.

what eventually became registrations numbered 648,113 and 648,144 for the marks Carl Upmann and Upmann's Repeater respectively, claim use in interstate commerce dating back to 1871. As told by Antonio Suarez, registrant of the marks and defendant's assignor and principal witness at trial, the history of the marks is as follows. In the early 1930's, a Tampa, Florida firm employing Suarez received a contract to manufacture the Carl Upmann line from what was then Carl Upmann, Inc., headed by one Carl Julius Upmann who was said to be a descendant of the cigar's namesake. Carl Upmann, Inc., a New York entity, was succeeded by another corporation, Upmann & Suarez, in 1941 which continued the sale (such as there was) of Carl Upmann cigars, using the same labels, bands, displays, etc. left over from Carl Upmann, Inc. Upmann & Suarez was dissolved in 1946 or 1947, however, and Suarez moved to Tampa where, according to his testimony, he continued the manufacturing and sale of Carl Upmann cigars and Upmann's Repeaters under the name of Antonio Suarez y Compania. Suarez applied to register the marks in 1954. After various difficulties were overcome,[12] the Patent Office accepted the registrations and published the marks in June of 1955. In 1962, Suarez filed a combined affidavit under Sections 8 and 15 of the Lanham Act, 15 U.S.C. §§ 1058, 1065.

Suarez has no records of his business either with Upmann or alone, and consequently, there is lack of or insufficient evidence upon which accurately to determine the extent of business done by him under the marks. Indeed, the only documentary proof of any sales whatsoever during the entire time Suarez owned or worked with the marks consists of a handful of orders covering a limited period in 1947. The evidence does support a finding that Carl Upmann or Upmann's Repeater never achieved acceptance by the smoking public that even came close to approaching the fame and financial success of H. Upmann. Whatever distribution of these cigars that may have been made was indeed sparse.

In 1963, Suarez sold his rights in the marks Carl Upmann and Upmann's Repeater to Zelick Gimelstein, owner of Zelick's Tobacco Corporation of Miami Beach, Florida. Gimelstein arranged shortly thereafter for the manufacture and sale of the cigars. When Zelick died in 1971, he was succeeded by his son Alex, chief executive of the defendant, who also testified at trial.

Defendant's cigars are presently manufactured in and imported from Honduras; at the time defendant acquired the marks, however, it arranged for their manufacture by a Tampa, Florida firm. Intermittent advertising in trade journals began in 1972, and was expanded somewhat in 1974. No advertising was done in the general media. The only evidence of sales offered goes back to 1966.[13] From that point until 1974, sales of both brands combined never went above 222,000 annually and, in fact, averaged approximately 115,120. In 1974, however, they rose to 465,000; in 1975, approximately 587,000 and in 1976, approximately 1,007,700 were sold. The 1977 sales are placed at over 1,474,200.

But 1974 was significant to defendant for another reason. In that year, Alex Gimel-

12. See text p. 1095 infra.

13. At trial, defendant's counsel offered six cartons of receipts and promised that he would prepare, with plaintiff, a breakdown of sales reflecting the receipts "during the luncheon recess." Counsel also promised to do this subsequent to the completion of trial. While noting that the breakdown should have been disposed of prior to trial, the Court acquiesced. When he delivered copies of the post-trial briefs and proposed findings, counsel promised that the breakdown would be delivered within a few days. After the reply papers were submitted, counsel still had not provided the breakdown.

On July 12, six weeks after the conclusion of the trial, the Court set a deadline of July 14, 1978, extended until Monday, July 17, 1978, for the submission of these figures.

When submitted, there were still disputes between the parties concerning the amounts of sale. Even resolving all such disputes in defendant's favor, the above figures represent the totality of business done since 1966 under these marks. It should also be noted that Carl Upmann sales account for by far the bulk of the total figures; in fact, in 1966, there were no sales of Upmann's Repeater whatsoever.

stein caused the incorporation of defendant under its present name, Upmann International, Inc. In July 1975, it applied to the Patent Office to register the mark of Upmann alone. Later, in September 1975, defendant commenced proceedings to cancel a number of former Cuban cigar marks, including H. Upmann, which had not yet resumed bulk sales in this country, claiming that the marks were abandoned, and with respect to H. Upmann, that it was confusingly similar to defendant's own marks.[14] The proceeding against H. Upmann was dismissed when defendant failed to clarify internal inconsistencies in its application.[15] Proceedings on defendant's application to register Upmann alone, to which H. Upmann objected, were suspended when this suit was commenced.

### B. Prior Interaction of the Parties

Suarez admitted that basically from the time he began with the Carl Upmann and Upmann's Repeater marks, he knew of the H. Upmann cigar. Whether the converse was also true—indeed, whether plaintiff knew of defendant's marks at all—is less clear.

According to Suarez, he was approached in the early 1940's by one Feuyo in New York City regarding a proposal for the sale of the Carl Upmann trademark and business to Menendez Garcia, but as the proposal did not include any job opportunity for his partner, Carl Julius Upmann, Suarez rejected it. Jose Garcia, plaintiff's principal witness and Menendez Garcia's principal, never heard of this alleged proposal.

Garcia had heard, however, that in the mid-1950's, Suarez approached Menendez Garcia through his partner, Alonso Menendez, concerning a proposal for the sale of the marks of Carl Upmann and Upmann's Repeater. Suarez admitted there were never any negotiations, and Garcia testified

that the company rejected the offer, "because we had never seen any of those cigars in the market."

Suarez thereafter applied to register the marks. Despite knowledge of the H. Upmann mark, Suarez falsely swore that "no other person, firm, corporation or association . . . has the right to use such trademark . . . or in such near resemblance thereto as might be calculated to deceive." Registration was initially refused in part because of the H. Upmann mark. Responding to that rejection, Suarez disclaimed any designs on "the surname 'Upmann' apart from" its use with either Carl or Repeater and further suggested that "[b]oth H. Upmann and Carl Upmann are distinctively different and no confusion can arise." Despite what appears to be a patent case of confusion, the Office apparently agreed with Suarez and passed the two marks for publication in May 1955.

Acting through its authorized trademark agent, Menendez Garcia filed oppositions in 1957 against the registrations of Carl Upmann and Upmann's Repeater. For reasons unknown, however, these oppositions were not perfected and were dismissed for the opposer's failure to respond. Garcia testified that he personally did not know of either the registration or of Menendez Garica's opposition. And, as noted above, Garcia knew of no sales with these marks.

In 1966, in connection with still another Patent Office proceeding,[16] Menendez Garcia's successor CIT deposed Suarez. Although wholly unrelated to the marks there at issue, Suarez did describe some of his past use with the Carl Upmann mark and his sale of the mark to Zelick Gimelstein in 1962 or 1963.

In 1975, when defendant sought registration of the mark "Upmann" alone, plaintiff objected and filed its notice of opposition in the Patent Office. As noted above, this

---

**14.** *See* note 4 *supra.*

**15.** In its petition, defendant listed Alex Gimelstein as the company's president. The notary public's certificate, however, stated that Gimelstein was the company's secretary. After clari-

fication was requested and no response was offered within a reasonable time, the petition was dismissed.

**16.** *Suarez v. Compania Insular Tabacalera, S.A.,* 157 U.S.P.Q. 712 (T.T.A.B.1968).

suit was then commenced suspending the Patent Office proceedings.

## II

Defendant's proof in its laches defense [17] must show that plaintiff had knowledge of defendant's use of its marks, that plaintiff inexcusably delayed in taking action with respect thereto, and that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time.[18] Obviously, whether the claim is sufficient to bar relief, " 'depends upon a consideration of the circumstances of each particular case and a balancing of the interests and equities of the parties.' "[19] Relying primarily on language in early Supreme Court cases, however, plaintiff argues that laches is never a defense to an action seeking an injunction—only to a claim for an accounting.[20] The Supreme Court itself, however, has repeatedly upheld the defense in an injunctive action [21] and the lower courts, explicitly and implicitly, have rejected the position urged by plaintiff.[22] Thus, "[w]here a person entitled to exclusive use of a trademark is guilty of unreasonable delay in asserting his rights against an infringer or junior user, . . . a court of equity has the discretionary power, after weighing the respective interests of the parties, to deny injunctive relief or an accounting."[23] But it is equally true that "the courts will more readily deny the dilatory plaintiff an accounting than an injunction."[24]

### A. Knowledge

Little need be said about the Feuyo approach to Suarez in the early 1940's. Whether or not the offer was in fact made, which itself is questionable, there has been no showing that Menendez Garcia had any knowledge of Suarez or Carl Upmann at that time, much less that they authorized anyone to offer to purchase the latter from the former.

17. It is clear that the burden of proving the defense is on the party asserting it. *See, e. g., John Wright, Inc. v. Casper Corp.,* 419 F.Supp. 292, 322 (E.D.Pa.1976).

18. *See, e. g., Jenn-Air Corp. v. Penn Ventilator Co.,* 464 F.2d 48, 49–50 (3d Cir. 1972); *John Wright, Inc. v. Casper Corp.,* 419 F.Supp. 292, 322 (E.D.Pa.1976); *Alfred Dunhill of London, Inc. v. Kasser Distillers Prods. Corp.,* 350 F.Supp. 1341, 1364–65 (E.D.Pa.1972), *aff'd mem.;* 480 F.2d 917 (3d Cir. 1973); 4 R. Callman, The Law of Unfair Competition, Trademarks and Monopolies, § 87.3(a), at 121 (3d ed. 1970).

19. *Carl Zeiss Stiftung v. VEB Carl Zeiss, Jena,* 433 F.2d 686, 703 (2d Cir. 1970), *cert. denied,* 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971), *aff'g and quoting* 293 F.Supp. 892, 917 (S.D.N.Y.1968) (Mansfield, J.).

20. *See Menendez v. Holt,* 128 U.S. 514, 523, 9 S.Ct. 143, 145, 32 L.Ed. 526 (1888) ("Mere delay or acquiescence cannot defeat the remedy by injunction in support of the legal right, unless it has been continued so long and under such circumstances, as to defeat the right itself."); *McLean v. Fleming,* 96 U.S. 245, 253, 24 L.Ed. 828 (1877) ("Equity courts will not, in general, refuse an injunction on account of delay in seeking relief, where the proof of infringement is clear, even though the delay may be such as to preclude the party from any right to an account for past profits.")

21. *French Republic v. Saratoga Vichy Spring Co.,* 191 U.S. 427, 24 S.Ct. 145, 48 L.Ed. 247 (1903); *Saxlehner v. Eisner & Mendelson Co.,* 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60 (1900).

22. *See, e. g., Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331 (2d Cir. 1975); *Carl Zeiss Stiftung v. VEB Carl Zeiss, Jena,* 433 F.2d 686 (2d Cir. 1970), *cert. denied,* 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971); *Polaroid Corp. v. Polorad Elec. Corp.,* 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *Anheuser-Busch, Inc. v. Du Bois Brewing Co.,* 175 F.2d 370 (3d Cir. 1949), *cert. denied,* 339 U.S. 934, 70 S.Ct. 664, 94 L.Ed. 1354 (1950); *Coca-Cola Co. v. Howard Johnson Co.,* 386 F.Supp. 330 (N.D.Ga.1974); *Haviland & Co. v. Johann Haviland China Corp.,* 269 F.Supp. 928 (S.D.N.Y.1967).

23. *Carl Zeiss Stiftung v. VEB Carl Zeiss, Jena,* 433 F.2d 686, 703 (2d Cir. 1970), *cert. denied,* 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971), *aff'g and quoting* 293 F.Supp. 892, 917 (S.D.N.Y.1968) (Mansfield, J.).

24. 4 R. Callmann, The Law of Unfair Competition, Trademarks and Monopolies, § 87.3(b), at 124 (3d ed. 1970); *accord, Coca-Cola Co. v. Howard Johnson Co.,* 386 F.Supp. 330, 334 (N.D.Ga.1974) ("The Court views the cases as stating the principle contended for by plaintiff as being generally, but not always, true.")

Suarez's approach to Menendez and Menendez Garcia's filing of opposition proceedings at most can be said to indicate that Menendez Garcia may have been aware that someone was attempting to claim rights to the marks Carl Upmann and Upmann's Repeater. But they do not demonstrate that there was any awareness on plaintiff's assignor's part of any sales with either mark which would justify the seeking of injunctive relief.[25] Indeed, Garcia's testimony was to the contrary and, as noted above, defendant offered no evidence other than Suarez's testimony to establish that there were any sales of which to be aware. Similarly, in the 1966 deposition of Suarez, although he recounted his entire history in the cigar business, including his involvement with Upmann & Suarez and his own business, Suarez also testified that he stopped manufacturing either brand in 1962 or 1963 when he sold whatever stock he had on hand to Zelick Gimelstein. There was no showing that there were then any sales with the marks or that plaintiff knew or should have known of any. Indeed, after observing Suarez's demeanor and considering the totality of testimony, I am persuaded that, aware of the valuable good will which attached to the trade name and mark H. Upmann, Suarez deliberately engaged in a program to simulate the H. Upmann name and then to get the owning interest to buy him off—a variant of the strike suit—failing which he then sold his interest in Carl Upmann and Upmann's Repeater to the defendant's predecessor.

But even assuming that plaintiff's predecessor did have sufficient knowledge of the Carl Upmann or Upmann's Repeater marks in 1957 when an agent, in the name of Menendez Garcia, filed opposition proceedings to defendant's marks,[26] it cannot be said that its failure to act further at that time was inexcusable. Not long after that proceeding was commenced, the Castro takeover drove the Menendez Garcia organization to the Canary Islands. The expenditure of time and capital required to rebuild the business necessarily caused attention and energy to be focused there and away from any alleged infringing activities in this country. Moreover, it was only in 1973, after prevailing at trial and on appeal in the bitterly contested and extended litigation with the Cuban government and others,[27] that plaintiff was even assured it still had a mark to protect.[28] Indeed, that very litigation, which extended over a period of more than ten years, establishes that plaintiff was a vigilant defender of its rights. Under the circumstances, whatever delay may be charged to plaintiff in asserting its rights was certainly excusable. Moreover, mere delay does not alone constitute laches;

---

25. *Cf. La Societe Anonyme des Parfums LeGalion v. Jean Patou, Inc.*, 495 F.2d 1265, 1270 n.5 (2d Cir. 1974) (Friendly, J.) ("The Lanham Act does not create the trademark right; it only recognizes the right acquired through use.")

26. There is some controversy concerning whether publication of a mark should constitute sufficient notice for purposes of a laches defense. *Compare Hylo Co. v. Jean Patou, Inc.*, 215 F.2d 282, 42 C.C.P.A. 723 (1954) *and Willson v. Graphol Prods. Co.*, 165 F.2d 446, 35 C.C.P.A. 857 (1948) (constructive notice from publication for purposes of laches defense), *with Valmor Prods. Co. v. Standard Prods. Corp.*, 464 F.2d 200 (1st Cir. 1972) *and* 4 R. Callmann, The Law of Unfair Competition, Trademarks and Monopolies, § 87.3(b)(1), at 128 (3d ed. 1970) (constructive notice not found from publication). *See also Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 535 (2d Cir. 1964) (Friendly, J.) (ques-

tioning whether *Willson v. Graphol Prods. Co.*, *supra*, "goes too far in attributing to an earlier registrant constructive notice of a subsequent infringing registration"). Here, however, the fact that opposition proceedings were commenced indicates that Menendez Garcia was aware of Suarez's registration.

27. *See* cases cited in note 10 *supra*.

28. In this regard, it is also appropriate to note that a trademark owner is not bound to take on more than one infringer at a time. *See, e. g., Electronic Communications, Inc. v. Electronic Components for Industry Co.*, 443 F.2d 487, 490 (8th Cir.), *cert. denied*, 404 U.S. 833, 92 S.Ct. 80, 30 L.Ed.2d 63 (1971); *Alfred Dunhill of London, Inc. v. Kasser Distillers Prods. Corp.*, 350 F.Supp. 1341, 1365 (E.D.Pa.1972), *aff'd mem.*, 480 F.2d 917 (3d Cir. 1973).

to interpose a successful defense, an alleged infringer must show more.[29]

## B. Prejudice

Defendant's sales, even in that portion of time for which evidence was introduced, were never extensive. That, of course, does not mean that plaintiff was free to disregard defendant with impunity until such time as defendant's efforts made the threat sufficiently immediate to warrant action.[30] But until 1972, defendant did no advertising; after that date and until 1974, it advertised only intermittently in trade journals. And until 1974, defendant did virtually the same amount of annual business.[31] Obviously, the defense of laches requires more by way of showing prejudice than the simple fact that the business continued during the period of delay.

The year 1974 marks the first real rise in defendant's sales and a slight increase in its advertising, which, however, was still limited to the trade journals. But even were the Court to accept defendant's apparent suggestion that the period from 1974 to 1977 would constitute sufficient delay for laches and that the rise in sales would demonstrate sufficient prejudice for laches,[32] defendant's other activities in that period and earlier, to which the increase in sales is more properly attributable than to added advertising, preclude defendant's assertion of that defense.[33]

## C. Good Faith

"Estoppel by laches is not available as a defense to a defendant who intended the unfair competition," [34] and thus "[i]n asserting the defense of estoppel the defendant should be required to establish his own good faith." [35] While an infringer claiming laches need not be in total igno-

29. It is clear that mere lapse of time does not constitute laches barring injunctive relief. *See, e. g., Carl Zeiss, Stiftung v. VEB Carl Zeiss, Jena*, 433 F.2d 686, 704 (2d Cir. 1970), *cert. denied*, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971); *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 614 (7th Cir. 1965); *Standard Oil Co. of Colorado v. Standard Oil Co.*, 72 F.2d 524, 527 (10th Cir. 1934); *Alfred Dunhill of London, Inc. v. Kasser Distillers Prods. Corp.*, 350 F.Supp. 1341, 1364–65 (E.D. Pa.1972), *aff'd mem.*, 480 F.2d 917 (3d Cir. 1973); 4 R. Callmann, The Law of Unfair Competition, Trademarks and Monopolies, § 87.-3(b), at 125 (3d ed. 1970) (and cases there cited).

30. *Polaroid Corp. v. Polarad Elec. Corp.*, 287 F.2d 492, 498 (2d Cir.) (Friendly, J.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *Thomas J. Carroll & Son Co. v. McIlvaine & Baldwin*, 183 F. 22, 27 (C.C.A.2d 1910) (L. Hand, J.); *Valvoline Oil Co. v. Havoline Oil Co.*, 211 F. 189, 195 (S.D.N.Y.1913).

31. In *Anheuser-Busch, Inc. v. Du Bois Brewing Co.*, 175 F.2d 370 (3d Cir. 1949), *cert. denied*, 339 U.S. 934, 70 S.Ct. 664, 94 L.Ed. 1354 (1950), a split panel upheld a defense of laches where, although there had been no appreciable increase in defendant's sales through the years, the majority found sufficient prejudice in defendant's considerable sums spent in advertising. Judge Goodrich dissented, solely on that ground. Supporting Judge Goodrich's position, *see Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 615 (7th Cir. 1965), where the court stated that if prejudice for laches "could consist merely of expenditures in promoting the infringed name. then relief would have to be denied in practically every case of delay."

32. *But see Miss Universe, Inc. v. Patricelli*, 271 F.Supp. 104, 110 (D.Conn.), *aff'd*, 386 F.2d 997 (2d Cir. 1967) ("the doctrine of laches is inapposite in this case where the evidence makes plain a history of slow encroachment upon plaintiff's preserve, of increasingly direct competition, and of sudden promotional expansion aimed at exploitation of a market created by plaintiff."); *accord, Independent Nail & Packing Co. v. Stronghold Screw Prods., Inc.*, 205 F.2d 921, 927 (7th Cir.), *cert. denied*, 346 U.S. 886, 74 S.Ct. 138, 98 L.Ed. 391 (1953); *John Wright, Inc. v. Casper Corp.*, 419 F.Supp. 292, 323 (E.D.Pa.1976); *A. T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 355 F.Supp. 365, 370–71 (S.D.N.Y.), *aff'd*, 470 F.2d 689 (2d Cir. 1972).

33. Given that "[t]he determinative factor" in assessing a claim of prejudice "is the injury to which the defendant . . . will be subjected if the injunction is issued," 4 R. Callmann, The Law of Unfair Competition, Trademarks and Monopolies, § 87.3(b)(1) at 131 (3d ed. 1970), it is relevant to note that defendant has introduced other, non-infringing brands, the sales of which appear to be increasing.

34. *Id.* § 87.3(b)(2), at 138.

35. *Id.* at 139.

rance of another's mark,[36] it must be able to demonstrate the absence of any intent to confuse and deceive the public;[37] there must be a lack of evidence showing a scheme to "foist upon the public the [products] of the defendant as those of" the plaintiff.[38] Defendant has not met its burden. Indeed, the evidence points to the opposite conclusion: defendant stopped just this side of actually claiming to be the prior manufacturer of plaintiff's cigar.

A 1972 brochure for the Carl Upmann and Upmann's Repeater cigars contained, as described by Gimelstein, a "little story," which began with the following: "Fine Havana cigars are not really gone, they have just moved to Honduras for the Duration." It goes on to describe the cigars as being made by "Cuban expatriates experts" and assures that they will "please the most discriminating smoker and relieve the disappointed consumer who longs for fine Havana cigars." Carl Upmann cigars were never manufactured in Havana; their manufacturing was moved from Tampa to Honduras, and the move had nothing to do with the "Duration." This "little story" could only be designed to suggest to those familiar with Menendez Garcia and its products, that Carl Upmann, "hand-made by Cuban expatriates experts," was, "for the Duration" the authorized substitute for the H. Upmann cigar. In 1974, although changing the brochure somewhat, the legend still began, "Fine Havana cigars are alive and well in Honduras."

The year 1974, with the corporate name changed to Upmann International, Inc., also marked the beginning of defendant's more active encroachment on plaintiff's preserve. First, rather than perpetuating the slight distinction existing between the two companies' marks, defendant sought to blur them completely by removing the only distinctive features of its own—the Carl preceding or the Repeater following—and then use the word Upmann alone. Second, even more egregious and demonstrative of lack of good faith, is defendant's effort to have cancelled—on precisely the same ground which had been rejected in the litigation with the Cuban government and others,[39] that the marks were abandoned—H. Upmann and two other marks. Obviously, if the marks had been abandoned there would be no bar to defendant's use, providing, of course, it did not attempt to pass the cigars as coming from their original Cuban manufacturers. Equally obvious, however, is that the owners could have been discovered and the vitality of the marks ascertained by simply checking the Patent Office file and writing to the owner listed therein; there was no call for defendant to file cancellation proceedings.

That the proceedings were filed along with defendant's other actions in this case, indicates an attempt, in effect, to corner the market on the Cuban cigar names. Gimelstein testified that these "names mean a lot in this industry." Gimelstein also knew that the public tended to confuse his cigars with plaintiff's—in fact, he had so sworn in defendant's petition to cancel the H. Upmann mark.[40] If it succeeded in getting H. Upmann out of the way, defendant would be the one and only Upmann left, and would be free to trade on the good will that H. Upmann had enjoyed—a calculated effort to appropriate the prior user's mark and good will. Defendant has tried to move its name and mark as close as possible to what it perceived to be the legal line, rather than keeping its mark and use distinct and separate; its misperception of where that line lies, evidencing as it does an intent to confuse and to deceive the public,

36. See, e. g., Anheuser-Busch, Inc. v. Du Bois Brewing Co., 175 F.2d 370, 376–77 (2d Cir. 1949), cert. denied, 339 U.S. 934, 70 S.Ct. 664, 94 L.Ed. 1354 (1950) ("Mere knowledge, of course, does not constitute fraud."); cf. Haviland & Co. v. Johann Haviland China Corp., 269 F.Supp. 928, 936–37, 956 (S.D.N.Y.1967) (and cases there cited).

37. See cases cited in note 36 supra.

38. French Republic v. Saratoga Vichy Spring Co., 191 U.S. 427, 439, 24 S.Ct. 145, 148, 48 L.Ed. 247 (1903).

39. See cases cited in note 10 supra.

40. See note 4 supra.

prevents it from asserting laches in this case,[41] even if it could prove the defense, which as indicated above, it cannot. But defendant argues that its use cannot be enjoined for its marks are incontestable.

### III

Having filed the prescribed affidavits under Sections 8 and 15 of the Lanham Act, 15 U.S.C. §§ 1058, 1065, defendant contends that its marks Carl Upmann and Upmann's Repeater are incontestable and their use cannot be enjoined. This argument, however, presumes that defendant purchased a mark which did not infringe upon any existing prior to its registration and that it used its mark in good faith. Neither presumption is correct.

■ Section 15 of the Lanham Act, 15 U.S.C. § 1065, provides in pertinent part that a mark registered and supported by the proper affidavits is incontestable

> except to the extent, if any, to which the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of the publication under this chapter of such registered mark.

Plaintiff's mark was used nationwide prior to 1954 when defendant's marks were registered. As such, defendant's marks are not incontestable as against that of plaintiff for, since defendant's use infringes plaintiff's valid common law rights obtained long prior to defendant's registration,[42] it has no shield of incontestability in a suit by plaintiff to enforce that mark.[43]

■ That defendant's use may be enjoined by plaintiff, however, does not alone mean that the marks may be cancelled.[44] But even a so-called "incontestable" mark may be cancelled and its use enjoined when the provisions of Section 14(c), 15 U.S.C. § 1064(c) are satisfied.[45] Under that section a mark is subject to cancellation "at any time . . . if the registered mark is

---

**41.** *See, e. g., Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331, 1344 (2d Cir. 1975); *Baker v. Simmons Co.,* 307 F.2d 458, 466 n.4 (1st Cir. 1962); *My-T-Fine Corp. v. Samuels,* 69 F.2d 76, 78 (2d Cir. 1934). As stated in *Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 615 (7th Cir. 1965), "[i]t is only . . . where the delay is so prolonged and inexcusable that it amounts to a virtual abandonment of the right by the plaintiff for a long period of time that the balance of the equities would favor the knowing infringer."

**42.** *See Burger King of Florida, Inc. v. Hoots,* 403 F.2d 904, 907 (7th Cir. 1968).

**43.** Perhaps the leading case construing this portion of 15 U.S.C. § 1065 is *Casual Corner Assoc. v. Casual Stores of Nevada, Inc.,* 493 F.2d 709 (9th Cir. 1974), where the Court held that to come within the exception under this section, a party must show (1) that its use of the mark began before its adversary's mark was registered and published, and (2) there has been continuing use since that time. Clearly, the first has been established here. The second, however, is somewhat less apparent, given that Court's holding that continuing use, as that term is used in the statute, is not the equivalent of non-abandonment, when H. Upmann's enforced absence from the United States market is considered. However, in determining non-use in that case, the Court indicated that a party could bridge the gap in actual sales if sufficient showing were made of good will remaining after the use was halted and that the party had the intent to resume use. In this case, that the good will H. Upmann enjoyed continued is evident from the press coverage it received when it reappeared on the American scene (plaintiff's exhibit 13–c) and the tremendous volume sold by CIT and plaintiff since sales resumed. And the Menendez Garcia organization and its successors clearly intended to continue use of H. Upmann as evidenced by their fight to keep the mark and the development of new blends. Finally, given the unusual circumstances entirely beyond the control of plaintiff or its predecessors which brought about whatever break there was in H. Upmann's sales, it would be inequitable to prevent plaintiff's assertion of its right herein.

**44.** *See, e. g., Union Carbide Corp. v. Ever-Ready, Inc.,* 531 F.2d 366, 374–75 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976) ("Section 1064, not incontestability under § 1065, 'protects the registrant from cancellation of his trademark by a prior user claiming superior rights,' because prior use is not a ground for cancellation under § 1064.").

**45.** 4 R. Callmann, The Law of Unfair Competition, Trademarks and Monopolies, § 97.3(c)(2) at 602 (3d ed. 1970).

being used by . . . the registrant so as to misrepresent the source of the goods . . . in connection with which the mark is used."

██ As stated above, the defendant here has blatantly misused these marks, attempting, via its brochures and efforts to procure the use of Upmann alone and to prevent plaintiff's continued use, to blur whatever distinctions exist between the parties' products, and trade upon the renown and reputation of plaintiff. Indeed, this effort to confuse the public extends to the packaging of the cigars themselves: while defendant's mark for Carl Upmann as registered is written in all capitals arranged horizontally, as used on its cigar boxes, the word Carl is in script and the word Upmann, emphasized in bold capital letters, is in an arc similar to that used by plaintiff. Defendant, by misusing its marks and encouraging the public to recognize its products as those of plaintiff, cannot claim that the marks are incontestable or protect them from cancellation.[46]

### IV

██ There remain but a few incidental issues to be decided and the appropriate relief to be granted. Defendant's plea that the Court cancel plaintiff's mark is denied. As our Court of Appeals has held, the fact that plaintiff was intervened by the Cuban government and thus prevented from exporting H. Upmanns to this country until recently does not constitute an abandonment of the mark.[47] Similarly, defendant's argument that plaintiff misrepresents the source of their product must be rejected. Each box of cigars made by CIT contains a brochure explaining the Menendez Garcia company's leaving Cuba and establishing itself in Las Palmas, Canary Islands. More-

over, given the wide publicity attending the Cuban boycott and the return of the non-Cuban H. Upmann, it is doubtful whether "the discriminating smokers who bought cigars bearing these trademarks, were not fully aware that Cuban cigars and Cuban tobacco were no longer obtainable in this country and that the cigars they bought . . . were not made of Cuban tobacco."[48] Finally, defendant's charge that plaintiff has debased the quality of its goods is spurious. It is sufficient to note: (1) the management of the Canary Islands company is in large measure made up of former Cuban employees or those trained by them; (2) plaintiff's quality control is impressive as is its fifteen-year effort to develop a cigar worthy of bearing the H. Upmann name; and (3) as our Court of Appeals has stated with respect to this mark, it cannot be assumed that "the American public would be deceived if the marks were now used on a high-quality non-Cuban tobacco."[49]

In sum, defendant is enjoined from continued use of the marks Carl Upmann or Upmann's Repeater, and the use of Upmann alone as a trademark or as part of its corporate name. Registrations numbered 648,113 and 648,144 for the marks Carl Upmann and Upmann's Repeater, respectively, are ordered cancelled.[50]

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law. Judgment upon notice may be entered accordingly.

**46.** *H. H. Scott, Inc. v. Annapolis Electro-acoustic Corp.*, 195 F.Supp. 208, 217 (D.Md.1961); 4 R. Callmann, The Law of Unfair Competition, Trademarks and Monopolies, § 87.3(c)(2) at 603 (3d ed. 1970).

**47.** *See* cases cited in note 10 *supra*.

**48.** *Menendez v. Faber, Coe & Gregg, Inc.*, 345 F.Supp. 527, 557 n.21 (S.D.N.Y.1972), *aff'd sub*

*nom. Menendez v. Saks & Co.*, 485 F.2d 1355 (2d Cir. 1973), *cert. denied*, 425 U.S. 991, 96 S.Ct. 2201, 48 L.Ed.2d 815 (1976).

**49.** *Menendez v. Saks & Co.*, 485 F.2d 1355, 1377 (2d Cir. 1973), *cert. denied*, 425 U.S. 991, 96 S.Ct. 2201, 48 L.Ed.2d 815 (1976).

**50.** 15 U.S.C. § 1119.