## HERMÈS INTERNATIONAL, Hermès Sellier, Hermès Gestion, Inc., and Hermès of Paris, Inc., Plaintiffs,

v.

## LEDERER DE PARIS FIFTH AVENUE, INC., Pelle Via Roma, Inc. Artbag Creations, Inc., and Rene Wang, d/b/a Rene Collection, Defendants.

### No. 98 CIV 2820(SAS).

United States District Court,
S.D. New York.

March 19, 1999.

---

John M. Desmarais, David S. Brafman, Joseph C. Gioconda, Kirkland & Ellis, New York City, James M. Amend, P.C., Kirkland & Ellis, Chicago, IL, for Plaintiffs.

Anthony H. Handal, Esq, Handal & Morofsky, Norwalk, CT, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiffs Hermès International, Hermès Sellier, Hermès Gestion, Inc., and Hermès of Paris, Inc. (collectively "Hermès" or "plaintiff") bring this action seeking both injunctive and monetary relief against defendants Lederer De Paris Fifth Avenue, Inc. ("Lederer"), Pelle Via Roma, Inc. ("Pelle"), Artbag Creations, Inc. ("Artbag"), and Rene Wang, d/b/a Rene Collection ("Rene")[1] claiming that defendants infringed plaintiff's trademark and trade dress rights in its line of women's handbags and other leather goods. Hermès alleges (i) trademark infringement in violation of Section 32 of the Lanham Act of 1946, 15 U.S.C. § 1114; (ii) false designation of origin, trade dress infringement and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (iii) trademark dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); (iv) trademark infringement and unfair competition in violation of New York common law; and (v) trademark dilution in violation of New York General Business Law § 360–1. Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, claiming that plaintiff's relief is barred by the doctrines of abandonment and estoppel by laches.[2] For the reasons stated below, defendants' motion is granted in part and denied in part.

---

1. Plaintiff Hermès reached a settlement with defendant J.S. Suarez, Inc. on December 18, 1998. The case against J.S. Suarez was dismissed on December 30, 1998.

2. An Amended Scheduling Order issued on July 15, 1998 directed the parties to limit their discovery to the issues of laches, estoppel, acquiescence, abandonment, policing and enforcement.

## I.  Background

### A.  Hermès

Hermès, a French company with eleven stores in the United States, has produced high-quality leather products since 1837.[3] *See* Declaration of Joseph C. Gioconda, counsel for plaintiff ("Gioconda Decl.") at Ex. 1, Hermès' Statement of Material Facts at ¶¶ 138, 141 ("Pl.'s 56.1 Stmt.").

Hermès' products have been sold in the United States since 1950 in both Hermès boutiques and upscale department stores.[4] *See id.* at ¶ 141. Between 1996 and 1998, United States sales of Hermès belts exceeded $5.8 million, sales of Hermès watches reached almost $3.5 million and sales of Hermès handbags topped $25.7 million. *See* Plaintiff's Responses and Objections to Defendant Pelle's First Set of Interrogatories, Attachment A, contained in Defendants' Motion for Summary Judgment ("Defs.' Mot.") at Ex. SJ1. In 1997, Hermès budgeted over $2 million for advertising in magazines, such as Elle, Vogue, Forbes, and the New Yorker. *See* Gioconda Decl. at Ex. 126.

All of its handbags are handmade by skilled craftsmen at Hermès' workshop in France. Hermès destroys any bag containing an imperfection. The interior of every bag identifies the craftsman who made it; if the bag ever needs repair, it is sent back to the original craftsman. *See* Pl.'s 56.1 Stmt. at ¶¶ 170–174. The products at issue in this dispute contain a combination of various characteristics that Hermès claims as its famous mark and trade dress. I shall briefly describe these characteristics.

### 1.  *The Rectangular Lock Design*

#### a.  The Kelly Bag

Hermès originally designed the Kelly bag in the 1930s and introduced it in the United States in approximately 1949. *See* Pl.'s 56.1 Stmt. at ¶ 141. Hermès named the Kelly bag for Grace Kelly, Princess of Monaco, who was often photographed carrying the bag. *See* Gioconda Decl. at Ex. 70. Hermès asserts that through public association with Princess Grace, the name "Hermès" became synonymous with "the maker of the Kelly bag." *See* Pl.'s 56.1 Stmt. at ¶¶ 140, 145–149. This famous association between the Kelly bag and Hermès remains to this day.[5]

A skilled craftsman spends approximately 16 hours creating each Kelly bag. Hermès asserts that elements of its Kelly bag are distinctive, such as its closure design of two thin, horizontal leather straps with metal plates at their ends that fit over a circular turn-lock, optionally secured with a small padlock.[6] *See* Gioconda Decl. at Exs. 11, 72; Pl.'s 56.1 Stmt. at ¶ 142. Hermès also claims that the bag's trapezoidal shape, its small semi-circular handle and its flap design are all features that are strongly associated with Hermès. *See id.* Since its introduction to the United States, Hermès has sold tens of thousands of Kelly bags. *See* Complaint ("Compl.") at ¶ 14.

#### b.  Kelly Watch

In 1975, Hermès introduced the Kelly watch to the United States. *See id.* at ¶ 17. The watch consists of a leather band, a gold "Kelly" turn-lock, and a timepiece shaped as a padlock hanging from

---

3.  Hermès became famous by selling prized leather horse harnesses and saddles to royalty throughout the world. *See* Pl.'s 56.1 Stmt. ¶ 138.

4.  Hermès' handbags range in price from $750 to over $30,000. *See* Gioconda Decl. at Ex. 66. The most expensive Hermès bag is an alligator skin Kelly bag, with platinum and diamond hardware. *See id.*

5.  *See* "Hermès Had 16% Profit Gain in First Half," N.Y. Times, Sept. 24, 1998 at C5 ("The maker of the Kelly bag, made famous by the actress Grace Kelly, said profit rose to 227 million French francs...").

6.  This closure design is protected by federal trademark Registration No. 1,806,107. This registration was published for opposition in 1993 and has never been challenged. *See* Pl.'s 56.1 Stmt. at ¶¶ 143–44.

the wristband. *See* Pl.'s 56.1 Stmt. at ¶ 165; Compl. at Ex. 5. The Kelly line also includes the Kelly Sport and Kellyado backpack, both of which feature the closure design.

### c. Birkin Bag

Hermès introduced the Birkin bag to the United States in 1984.[7] *See* Compl. at ¶ 15. The Birkin bag is a larger bag featuring the same characteristics as the Kelly bag, such as the lock closure and the trapezoidal shape.[8] *See* Pl.'s 56.1 Stmt. at ¶ 150; Compl. at Ex. 3.

### 2. *The "H" Design*

Several of Hermès' products, including handbags, shoes, belts, billfolds and watches bear the "H" design. Hermès introduced the Constance bag to the United States in approximately 1969.[9] *See* Compl. at ¶ 19. The Constance bag features a large gold "H" used as the closure on the bottom front of the bag.[10] *See* Pl.'s 56.1 Stmt. at ¶ 155; Gioconda Decl. at Ex. 13.

Hermès introduced the "H" belt (leather belt with a gold "H" buckle) to the United States in 1967. *See* Compl. at ¶ 21 and Ex. 8. Hermès introduced "H" shoes (leather loafers with an "H" buckle across the tongue of the loafer) to the United States in the early 1970's. *See id.* at ¶ 22 and Ex. 9. In 1996, Hermès introduced the "H" watch, featuring a gold "H" design as the watch face, to the United States. *See id.* at ¶ 23 and Ex. 10. Hermès also designed an "H" wallet featuring a gold "H" as the clasp.[11] *See id.* at Ex. 12.

### 3. *Other Designs*

#### a. Evelyne Bag

In approximately 1979, Hermès introduced the Evelyne bag to the United States. *See* Correspondence of David Brafman, Counsel for Hermès to the Court, dated February 22, 1998. The Evelyne features an "H" shape surrounded by an oval imprinted into the leather with perforations. *See* Compl. at Ex. 11.

#### b. The Harnais Watch

In 1996, Hermès introduced the Harnais watch to the United States. *See id.* ¶ 26 and Ex. 13. The design, inspired by the shape of a horse's harness, consists of a leather band that continues around the watch face. *See id.*

### B. Hermès Efforts to Combat Copying

For many years, Hermès has been aware of the availability of copies of its merchandise made and sold by others who are not defendants in this action. Customers periodically informed Hermès of the availability of knock-off copies of its bags. *See* Pl.'s 56.1 Stmt. at ¶ 17. Hermès' communications department forwarded magazine articles to Mr. Dumas containing information about Hermès knock-offs. *See id.* at ¶ 18. In addition, Hermès' in-house legal department had been notified of knock-offs of Hermès products. *See* Deposition of Jean–Louis Dumas ("Dumas Dep.") at 57, attached to Defs.' Mot.

Hermès states that it implemented a two-pronged approach to combat copying.

---

7. Jean–Louis Dumas, the President of Hermès, named this roomy bag after he met actress Jane Birkin, who was struggling to find diapers for her baby in the bag she was carrying. *See* Pl.'s 56.1 Stmt. at ¶ 151.

8. However, the Birkin front flap and handles differ from the Kelly. *See* Pl.'s 56.1 Stmt. at ¶ 150; Gioconda Decl. at Ex. 12.

9. The Constance bag was a favorite of Jacqueline Kennedy Onassis. *See* Pl.'s 56.1 Stmt. at ¶ 154; Gioconda Decl. at Ex. 82.

10. The "H" design is protected by federal trademark registration No. 1,806,108. This registration was published for opposition in 1993 and has never been challenged. *See* Pl.'s 56.1 Stmt. at ¶ 157.

11. It is not clear from the record when the "H" wallet was introduced to the United States.

First, Hermès sent letters to department stores with which it had a contractual arrangement to sell Hermès merchandise to discourage them from selling knock-offs. *See, e.g.,* Defs.' Mot. at Ex. AK; Pl.'s 56.1 Stmt. at ¶ 33 (I. Magnin Department Store, 1984–87); Defendants' Reply Memorandum ("Defs.' Rep.") at Exs. 7, 8 (Bergdorf Goodman, 1991–92); Gioconda Decl. at Exs. 62–63 (Bloomingdale's, 1995). The tone and language of Hermès' correspondence indicates that Hermès' strategy was to discourage the sale of knock-offs by suggesting that the stores were violating the "spirit" of their contractual relationships with Hermès, rather than to assert its trademark or trade dress rights by threatening litigation.

Second, because of the financial and physical difficulties of policing local retailers in many different countries, Hermès attempted to cut-off their supply at its source by litigating against overseas manufacturers. Hermès asserts that it has successfully sued over 100 manufacturers within the past 25 years. *See* Pl.'s 56.1 Stmt. at ¶¶ 179–182. Hermès has sued at least 93 infringers in Italy, has enjoined the activities of many manufacturers in Italy and France and has negotiated several settlement agreements in which infringers agreed to cease producing copies. *See* Gioconda Decl. at Ex. 8, Declaration of Pierserafino Marsico, Plaintiff's counsel in Italy, ("Marsico Decl.") at ¶ 1.

## C. The Defendants

The four defendants operate retail stores selling handbags and accessories, including belts, wallets, shoes, and watches in the high-fashion shopping district on Manhattan's Upper East Side.[12] Two defendants, Lederer and Artbag have been selling Hermès' copies for approximately forty years. Pelle and Rene, by contrast, have been selling copies for only two or three years. Generally, the copies are indistinguishable from genuine Hermès products, except that the interior of each genuine Hermès bag contains its craftsman's stamp.

Lederer claims that it has been selling a version of the Kelly bag since the 1950s. *See* Defendants' Notice of Motion for Summary Judgment ("Defs.' Notice") at 5. Artbag reports that it has sold $1.2 million worth of its Kelly knock-off in the past thirty-eight years; $500,000 worth of its knock-off Constance bag in the past twenty years; $100,000 of its knock-off Birkin bag in the past four years; $300,000 of its knock-off Bugatti bag[13] in the past six years; and $300,000 worth of its knock-off "H" belts in the past ten years. *See* Affidavit of Donald Moore, owner of Artbag, dated December 9, 1998, Defs.' Mot. at Ex. A, at ¶ 7.

Pelle has sold copies of the Kelly, H-bag, Bugatti, Birkin and Evelyne bags since November 1995. *See* Affidavit of Alexander Zar, Pelle employee, dated December 10, 1998, at ¶ 2. For the past three years, Pelle's sales of the Kelly have exceeded $186,000; sales of the Birkin exceeded $206,000; sales of the H-bag exceeded $39,000; sales of the Evelyne exceeded $16,000, and sales of the Bugatti exceeded $60,000. *See id.* Pelle also sells H-belts and scarves similar to Hermès' scarf designs. *See* Deposition of Alexander Zar, dated August 21, 1998, at 66. Rene has carried copies of the Kelly and Bugatti bags since 1996; and the H-bag, H-belt and Birkin bag for the past year. Rene's sales of the Kelly and Bugatti bags over the past two years have been $20,000 and $10,000 respectively. Sales of the Birkin bag total approximately $6,000; and combined sales of the H-bag and H-belt were

---

**12.** Lederer, Artbag and Rene are all located on Madison Avenue within ten to fifteen blocks of one another, and Pelle is located in the same vicinity on Park Avenue. Hermès' Manhattan boutique is located on Fifth Avenue within seven blocks of Lederer.

**13.** The Bugatti handbag also features the Hermès trade dress.

approximately $3,000. *See* Affidavit of Hae-sook Yang, Rene employee, dated December 10, 1998 at ¶ 5.

### D. Hermès Knowledge of Defendants' Copying

Hermès claims that until the time of the filing of this suit, infringement of Hermès leather products in the United States was limited in scope. *See* Pl.'s 56.1 Stmt. at ¶ 186. After learning that Lederer was selling copies of its Harnais watch in 1996 (prior to Hermès' own introduction of the watch to the United States), Hermès began to investigate the extent of the alleged infringement. *See id.* at ¶¶ 188–190. Hermès discovered that defendants were now selling entire lines of knock-off Hermès' products, including products such as the Kelly, Birkin, Constance, Bolide, Bugatti, Evelyne, Trim, Feudoux, Kelly Sport, Kellyado, and Jige bags,[14] the "H" belt, the "H" billfold, "H" shoes, the Harnais and Kelly watches and silk scarves. *See id.* at ¶¶ 191–193. Finding that defendants' knock-offs now cost upwards of $27,000 for a Kelly bag and $100 for an "H" belt, Hermès charges that the overlapping price range of defendants' products with its own places them in direct competition for Hermès' high-end customers. *See id.* at ¶¶ 195, 197–99. In addition, Hermès worries that with the presence of the Internet, the formerly local problem has now expanded into a national and perhaps international problem.[15] *See id.* at ¶¶ 200–202.

#### 1. *Prior Knowledge*

Despite Hermès' assertion that it was unaware of the scope of defendants' copy-ing activity until 1996, there is evidence that it had prior knowledge of several specific knock-offs. Since the early 1970's, the President of Hermès, Jean–Louis Dumas, has visited New York City several times every year. *See id.* at ¶¶ 3, 6. During his visits in the 1970's, Mr. Dumas saw knock-off versions of the Kelly, Constance, and Trim bags in the window of defendant Lederer. *See* Dumas Dep. at 58–59. In approximately 1985, Mr. Dumas saw a copy of the Evelyne handbag and the "H" belt in Lederer's store window. *See id.* at ¶¶ 10–11. In the late 1980's, Mr. Dumas saw a copy of the Bugatti bag in Lederer's store window. *See id.* at ¶ 12. Since at least as early as 1989, Hermès had notice of Lederer's sale of a copy of the Birkin bag. *See id.* at ¶ 27. Mr. Dumas also recalls seeing a copy of what he thought was a Kelly bag in the window of defendant Artbag sometime in the 1980's. *See* Dumas Dep. at 39–40. Mr. Dumas never saw the windows of defendants Rene and Pelle. *See* Dumas Dep. at 60. At no time prior to filing this suit in April 1998, did Hermès send the four defendants any cease and desist letters or make any contact with them whatsoever to express its disapproval of their use of Hermès' designs.

#### 2. *Undercover Investigation*

Before filing the instant litigation, Hermès sent undercover investigators to defendants' stores and tape-recorded representations made by defendants' salespeople regarding the Hermès copies.

***Lederer:*** On one occasion, a Lederer employee represented that the "H" logo on a Lederer knock-off Constance bag re-

---

14. Although not described in this opinion, the Bolide, Feudoux, Kelly Sport, Kellyado and Jige are other handbags utilizing the Hermès trade dress.

15. Pelle via Roma was listed as a source for Hermès knock-off bags on the Internet. *See newyork.citysearch.com* (visited Jan. 21, 1999) <http://newyork.citysearch.com>. Although Pelle uses its own model names for each of the bags in its store, the website displayed photographs of the Pelle bags, with the model names of Hermès products listed below them. *See id.*

Lederer is also mentioned as a source for Hermès copies on a website devoted to the New York metropolitan area. *See Resource Advantage* (visited Feb. 11, 1999) <http://www.resource.com/womensleather-goods.htm>.

ferred to "Hermès," but then explained that a real Hermès bag would be much more expensive. *See* Gioconda Decl. at Ex. 108. However, Charles Blau, the owner of Lederer, stated that the "H" does not stand for any name; it is merely a "design." *See* Deposition of Charles Blau ("Blau Dep.") at 39. On another occasion, Blau erroneously informs an undercover investigator that "the workmanship and the quality" of Lederer's knock-off "H" bag is "identical" to Hermès. Gioconda Decl. at Ex. 61.

*Artbag:* An Hermès investigator recorded a conversation with a salesperson at Artbag:

Investigator: And this is H?

Salesperson: Stands for Hermès.

Investigator: And this is a . . .

Salesperson: It's a copy. It's not Hermès.

Gioconda Decl. at Ex. 109. Donald Moore, owner of Artbag, claimed that he was unaware that "H" stood for Hermès, stating that it stood for "a letter in the alphabet, of course." Deposition of Donald Moore ("Moore Dep.") at 56.

*Pelle:* A Pelle salesperson stated "we're a direct copy. Everything, design, color, leather. Everything we do is Hermès." Gioconda Decl. at Ex 104. Pelle indicated that its merchandise was indistinguishable from Hermès, such that any person who saw a purchaser walking down the street with a Pelle bag would be fooled into thinking it was Hermès. *See id.* at Ex. 111. In addition, Pelle represented that Hermès and Pelle knock-offs were manufactured in the same manner with leather of identical quality. *See* Gioconda Decl. at Exs. 104, 118.

*Rene:* A Rene salesperson boasted that Rene had copies of all of Hermès' newest models which looked "exactly like Hermès". Gioconda Decl. at Exs. 105, 113.

## II. Summary Judgment Standard

A motion for summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997). Once this burden has been met, the non-moving party must come forward with evidence that is more than "mere speculation and conjecture," *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990), but "would be sufficient to support a jury verdict in its favor." *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995).

In determining whether summary judgment should be granted, the court resolves all ambiguities and draws all reasonable inferences against the moving party. *See D'Amico v. City of New York,* 132 F.3d 145, 148 (2d Cir.1998). The moving party, however, is not required to affirmatively disprove unsupported assertions made by the non-movant, *see Celotex,* 477 U.S. at 323, 106 S.Ct. 2548, and if the evidence presented by the non-movant is "merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas,* 143 F.3d 105 (2d Cir. 1998) (quoting *Liberty Lobby,* 477 U.S. at 249–250, 106 S.Ct. 2505). The court must also examine "the substantive law applicable to the underlying litigation since that law dictates which facts are material." *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir.1993)(citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

## III. Discussion

█ In their motion for summary judgment, defendants assert the defenses of

abandonment and estoppel by laches to bar the relief sought by Hermès. It is well established that these equitable defenses may be applied to cases brought under the Lanham Act. *See, e.g., Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037 (2d Cir.1980). To avoid any semantic confusion, I shall briefly describe the difference between these two defenses. Abandonment may result from a trademark owner's failure to sue *others* in general. Estoppel by laches may be asserted when a lengthy failure to initiate litigation against *any particular* defendant causes prejudice to that defendant. *See 2 McCarthy on Trademarks and Unfair Competition* ("*McCarthy*") (4th ed.1998) § 17:17. Thus, laches is a personal defense, while abandonment "is a loss of rights as against the whole world." *Id.* at 17–24.

## A. Abandonment

■ Abandonment occurs if a mark's use has been discontinued without intent to resume use or

> [w]hen any course of conduct of the owner, including *acts of omission* as well as commission, causes the mark to *become the generic name* for the goods or services on or in connection with which it is used or otherwise to *lose its significance as a mark.*

15 U.S.C. § 1127 (emphasis added). Here, defendants assert abandonment by omission—failure to police—rather than abandonment by non-use. A mark may become abandoned if the owner fails to police the mark, such that widespread use by competitors leads to a generic understanding

among relevant consumers. *See 2 McCarthy* § 17:8; *see also Saxlehner v. Eisner & Mendelson Co.,* 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60 (1900) (trademark name "Hunyadi" became generic term for Hungarian mineral water due to trademark owner's failure to sue competitors for twenty years). Once a mark becomes generic, "it ceases to function to identify a single source of that generic thing." 5 *McCarthy* § 17:19 at 17–7.

Defendants assert that Hermès' tolerance of knock-offs produced and sold by many other manufacturers, designers and retailers, has resulted in the weakening of Hermès' trade dress to the extent that it no longer serves to identify its origin or source to consumers.

## 1. Hermès Trademark Or Protectable Trade Dress

■ Both parties acknowledge that the Court need not address whether Hermès' designs are protectable trademark or trade dress [16] at this stage in the litigation. Nevertheless, defendants argue that: (1) Hermès' trademark registrations were obtained by fraudulent representations and are, therefore, invalid; and (2) Hermès' trade dress does not meet the Second Circuit's stringent requirements for trade dress protection as articulated in *Knitwaves, Inc. v. Lollytogs Ltd.,* 71 F.3d 996 (2d Cir.1995). Given the limited discovery conducted by the parties for the purposes of this motion and lack of briefing on this issue, I will not address defendants' assertions.[17]

---

**16.** Historically, "trade dress" connoted only a product's label or packaging. Today, trade dress has taken on a broader meaning to include "the design and appearance of the product as well as that of the container and all elements making up the total visual image by which the product is presented to customers." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27 (2d Cir.1995).

**17.** However, the question raised by defendants' second concern, whether Hermès' trade dress is protectable involves an analysis similar to that raised by abandonment—has

the mark "cease[d] to function to identify a single source." When assessing the protectability of trade dress in product design, courts in this Circuit ask "whether the design [is] likely to be understood as an indicator of the product's source." *Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 378 (2d Cir.1997). In *Samara Bros. v. Wal–Mart Stores, Inc.,* 49 U.S.P.Q. 1260, 165 F.3d 120, 125 (2d Cir.1998), the Second Circuit found that because the high level of specificity in a line of children's clothing created a recognizable "distinctive overall look," the line pos-

## 2. Defendants' Evidence of "Genericness" of Hermès' Designs

Defendants' evidence of the genericness of Hermès' handbag designs centers on the frequent appearance of copies of the Kelly bag in the fashion press and stores over a forty year period.[18] Defendants fail to offer any significant evidence of the genericness of Hermès' designs, other than the Kelly bag.

## 3. Evidence of Hermès' Source Identification

### a. Direct Copying

■ The best evidence that Hermès' products indicate their source may, in fact, be defendants' own direct copying. Indeed, "evidence that a mark has been widely copied actually acts as persuasive evidence that the mark has become distinctive as a source-identifier." T. Anthony Ltd. v. Louis Vuitton Malletier, 30 U.S.P.Q.2d 1214, 1217 (S.D.N.Y.1993) (citing LeSportsac, Inc. v. K Mart Corp., 754 F.2d 71, 78 (2d Cir.1985) (intentional copying found to be the most persuasive evidence of secondary meaning)). Defendants' business success in selling Hermès knock-offs is premised on the strong iden-

tification of the Hermès "look" among consumers. Defendants boast that their bags are identical to Hermès merchandise and that no one will be able to tell the difference between defendants' knock-offs and genuine Hermès.

### b. The Strength of Hermès' Mark Or Trade Dress

Although at this juncture, I will not address the issue of whether Hermès' mark or trade dress is protectable, there is evidence to indicate that Hermès' Kelly and "H" designs have worldwide recognition as a result of extensive advertising and unsolicited media attention.[19] According to Stanley Marcus, founder of Neiman–Marcus, the handbags and belts at issue in this litigation "are strongly associated with Hermès, [and] . . . Hermès—and not Lederer—has always been, and still is today, identified as the creator of these designs and the source of these products." Declaration of Stanley Marcus, dated December 21, 1998, attached to Pl.'s Mem. at Ex. 3 at ¶ 2.

### c. Consumer Survey

Hermès commissioned Dr. Yoram Wind to conduct a post-sale confusion survey.

sessed sufficiently distinctive trade dress warranting protection under Section 43(a). Id. Determining whether Hermès' line of handbags and other merchandise is inherently distinctive protectable trade dress requires a highly fact-intensive analysis. See, e.g., Sara Lee Corporation v. American Leather Products, No. 97 C 4158, 1998 WL 433764 (N.D.Ill. 1998) (although many features of Coach handbags seen in other products, overall image of Coach bags sufficiently unique to warrant trade dress protection).

18. Defendants note, but do not provide to the Court, over 70 advertisements in the United States fashion press over the past 30 years for Kelly-style bags sold by approximately 30 different manufacturers. David Weber, an employee of handbag manufacturer "Finesse" for over 40 years avers that his company was hired in the 1950s by retailer I. Magnin to produce "Kelly" handbags. See Weber Affidavit, dated December 11, 1998, attached to Defs.' Mot. at ¶ 4. Moreover, during the 1950s and 1960s, Weber was aware of over half a

dozen manufacturers producing similar "Kelly" bags. See id. at ¶¶ 6, 13. In addition, Joseph Suarez stated that what Hermès refers to as its "Kelly" bag was really known to his United States customers as a "Lederer" bag. See Deposition of Joseph Suarez, at 74. A 1991 article in the fashion press describes the Kelly bag as the "most predominant fashion silhouette in the market," noting its manufacture by several companies in addition to Hermès. "Handbags: Beyond Kelly," Accessories, May 1991, Defs.' Mot. at Ex. AG. A 1990 New York Times article mentions the availability of a "baby Kelly" bag "based on the prototype Hermès version" at Artbag. Defs.' Mot. at Ex. AI. Moreover, in 1998, stores such as Saks Fifth Avenue, T. Anthony, Moschino, Versace and Maraolo advertised the sale of handbags similar in shape to the Kelly bag. See Advertisements attached to Defs.' Mot. at Exs. M, N, P, Q and R.

19. See, e.g., recent newspaper and magazine articles attached to Gioconda Decl. at Exs. 58, 59, 60, 65–68, 77–79, 81, 82, 130.

*See* Declaration of Dr. Yoram Wind (Wind Decl.), dated December 28, 1998, attached to Gioconda Decl. at Ex. 2. Dr. Wind concluded that there was a strong association between the Kelly bag design and its source (as well as a high probability of confusion between defendants' and Hermès' bags). *See id.* at ¶ 21. According to Dr. Wind, 70% of the 47 respondents who were shown Lederer's Kelly bag (as carried by a woman walking at a distance of four feet) identified Hermès as the manufacturer. *Id.* at ¶ 16. In addition, 45% of the respondents who identified Hermès as the source of the Lederer knock-off, explicitly and voluntarily mentioned the Kelly name.[20] *Id.* at ¶ 19. Defendants criticize the accuracy of the survey results on several grounds, including the suggestibility of the survey and that Dr. Wind incorrectly interpreted some responses.[21]

While the Wind survey may not be reliable, a properly conducted survey might result in some evidence of single source identification. Defendants' failure to offer its own consumer study supporting its argument that Hermès' designs are generic weakens their abandonment defense. *See, e.g., Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.,* 985 F.Supp. 372, 375–76 (S.D.N.Y.1997)(defendant who lacked consumer survey failed to establish plaintiff's mark was generic); *see also* 2 *McCarthy* § 12:14 at 12–30 ("[c]onsumer surveys have become almost de rigueur in litigation over genericness.... A litigant who does not introduce a survey to support a generic challenge may be viewed as less than serious by many judges").

### d. Conclusion

■ The abandonment defense requires a highly factual analysis of consumer perception and identification of the Hermès designs. Defendants have simply not met their burden of proof in showing that Hermès' designs are in the public domain and no longer identify Hermès as their source. If the movant carries its burden, summary judgment will be granted unless the party opposing the motion offers some evidence that a genuine issue of material fact exists. Because I find that defendants have not met their burden, I need not determine whether Hermès has presented evidence to preclude summary judgment. Therefore, summary judgment for all four defendants based on abandonment is denied.

### B. Estoppel by Laches

Defendants Artbag and Lederer also assert the defense of estoppel by laches to bar Hermès' requested monetary and injunctive relief.

### 1. *Laches As A Bar to Monetary Damages*

■ In order to prevail on this defense, Lederer and Artbag must prove that "plaintiff had knowledge of defendant's use of its marks, that plaintiff inexcusably delayed in taking action with respect thereto, and that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time." *Saratoga,* 625 F.2d at 1040 (quoting *Cuban Cigar Brands, N.V. v. Upmann Int'l, Inc.,* 457 F.Supp. 1090, 1096 (S.D.N.Y.1978), *aff'd without opinion,* 607 F.2d 995 (2d Cir. 1979) (sixty-nine year delay against inno-

---

20. Dr. Wind used Coach and Ferragamo bags as controls. These bags were mistaken for Hermès bags by only 9% of respondents. Only 4% of the respondents correctly identified Lederer as the maker. *See id.* at ¶ 16.

21. Respondents were intercepted randomly on East 57th Street in Manhattan (the Hermès boutique also happens to be located on East 57th Street). *Id.* at ¶ 11. In order to limit the survey universe, women over 18 years of age were asked if they were familiar with, ever bought or received, or wished to buy or receive a Coach, Hermès or Suarez handbag. *See* Communications Study Screener at 2, Attached to Pl.'s Mem. at Ex. 2. Eligible respondents were then invited to tea in a private room at the Four Seasons Hotel and given $150 for their participation in the 15 minute survey. *See id.* at 6.

cent defendant who relied on plaintiff's inaction constituted estoppel by laches barring all relief)). Whether this is sufficient to bar relief "depends upon consideration of the circumstances of each particular case and a balancing of the interests and equities of the parties." *Cuban Cigar,* 457 F.Supp. at 1096.

### a. Hermès' Knowledge of Defendants' Use

Defendants have proven, as they must, that Hermès had actual or constructive notice of defendants' activities. *See Chandon Champagne Corp. v. San Marino Wine Corp.,* 335 F.2d 531 (2d Cir.1964). Because in a motion for summary judgment, the Court resolves all ambiguities and draws all reasonable inferences against the movant, I accept Hermès' view of the length of time between its knowledge of defendants' activity and the filing of this litigation.

| Year Hermès learned of defendants' copying | Lederer Copy | Artbag Copy | Delay prior to filing this litigation in 1998 |
| --- | --- | --- | --- |
| 1979 | Kelly, Constance, Trim | | 19 years |
| 1985 | Evelyne, H–Belt | | 13 years |
| 1989 | Bugatti, Birkin | Kelly | 9 years |
| 1996 | Harnais watch, H-watch | | 2 years |

Once defendants have shown Hermès' knowledge of their activities, the Court must next analyze the magnitude of the prejudice to defendants and the length of the plaintiff's delay in enforcing its rights.

### b. Inexcusable Delay

■ Defendants must show that Hermès *inexcusably* delayed in bringing this litigation. To excuse its delay, Hermès' submits that defendants have only recently begun selling products of comparable quality and price, shifting into direct competition with Hermès. Plaintiff argues that its delay may be excused under the theory of "progressive encroachment". "[W]here a defendant begins use of a trademark or trade dress in the mar-

ket, and then directs its marketing or manufacturing efforts such that it is placed more squarely in competition with the plaintiff, the plaintiff's delay is excused." *Kason Indus., Inc. v. Component Hardware Group, Inc.,* 120 F.3d 1199, 1205 (11th Cir.1997). Under this theory, plaintiff's delay need not be measured from the first time defendants used Hermès' designs, but rather from the date that defendants' acts "first significantly impacted on plaintiff's good will and business reputation." 5 *McCarthy* § 31:19 at 31–43.

Even if the Court were to accept this theory, Hermès has failed to provide evidence that defendants' activities were of such low profile or sales that they did not significantly impact on plaintiff's rights until very recently. *See id.* at § 31:19. Defendants deny that the quality or price of their products have increased recently. Lederer claims that its prices on the Kelly, "H", Bugatti/Bolide, Constance, and Birkin bags have remained unchanged for the past five years. *See* Affidavit of Charles Blau, dated January 4, 1999, Defs.' Reply at Ex. 4, ¶ 2. Lederer sells most bags for between $300 and $700, although bags made with exotic leathers, such as alligator, can sell for several thousand dollars. *See id.* Artbag contends that its prices on Hermès knock-offs have increased on average, only 2–3% per year. *See* Affidavit of Donald Moore, dated January 4, 1999, Defs.' Reply at Ex. 2 at ¶ 4. In addition, Hermès has not provided any evidence for its assertion that defendants' Internet presence has substantially increased their sales volume or geographic scope of customers.

With the exception of the Harnais and "H" watches, Hermès was aware of Lederer's and Artbag's copying of various Hermès products for between nine and nineteen years. Without evidence of progressive encroachment, the length of Hermès' delay is inexcusable.[22] Soon after

---

22. Another potential justification for Hermès' delay is the impossibility of policing every

local retailer. However, the open and obvious display by Artbag and Lederer, within

Mr. Dumas saw copies of Hermès merchandise in the defendants' windows, some form of affirmative action to police Hermès' mark or trade dress should have occurred. In the absence of so much as a warning letter, defendants may not have appreciated plaintiff's view that it was entitled to exclusive use of certain designs. *See Menendez v. Holt*, 128 U.S. 514, 523, 9 S.Ct. 143, 32 L.Ed. 526 (1888)("[t]he intentional use of another's trademark is a fraud; and when the excuse is that the owner permitted such use, that excuse is disposed of by affirmative action to put a stop to it"). A simple warning letter would have been sufficient to lessen the severe delay before filing this action. *See Saratoga Vichy*, 625 F.2d at 1041; *see also Dial–A–Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F.Supp. 1339, 1357 (E.D.N.Y.1994)(defendant who received several warning letters and phone calls prior to suit could not claim it was unaware of plaintiff's superior rights).

■ There is no magical number of years constituting delay sufficient to bar a claim by laches. Professor McCarthy has suggested a simple formula to quantify the delay and prejudice necessary to support a laches defense: laches = delay × prejudice. *See 5 McCarthy* § 31:12. Thus, a short delay with great prejudice or a long delay with little prejudice will suffice. *See, e.g., Le Cordon Bleu v. BPC Publishing, Ltd.*, 327 F.Supp. 267 (S.D.N.Y.1971) (plaintiff's thirteen week delay sufficient bar to issuance of preliminary injunction where defendant spent over $1 million dur-

ing those thirteen weeks). Here, defendants have shown an extremely long delay of nine to nineteen years for Hermès to assert its rights with regard to the Kelly, Constance, Trim, Evelyne, Bugatti, Birkin, and H-belt.[23] This lengthy delay combined with slight prejudice would suffice to bar plaintiff's requested monetary relief.

### c. Prejudice to Defendants

■ Prejudice by delay occurs when the assertion of a claim available long ago would be "inequitable" in light of the delay in bringing that claim. Specifically, prejudice ensues when a "defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed." *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187 (2d Cir.1996)(five year delay precluded possibility defendant could adopt alternative marketing position). Both Artbag and Lederer have shown prejudice resulting from Hermès' delay. Charles Blau averred that he purchased Lederer in 1993 in reliance on continued sales of the products involved in this lawsuit. *See* Defs.' Not., Blau Affidavit at ¶ 1. Donald Moore, owner of Artbag, stated that over the past thirty-eight years, Artbag has sold almost $2.5 million of Hermès knock-off merchandise. *See* Moore Aff. at ¶ 7; Gioconda Decl. at Ex. 90, Moore Dep. at 52. These knock-offs account for 15–20% of Artbag's total sales. *See id.*[24]

■ Defendants have met their burden in showing that Hermès' inexcusable delay caused them prejudice. Hermès has not

---

blocks of Hermès' own Manhattan store, should have alerted Hermès that its strategy of policing overseas manufacturers had apparently failed with regard to these two defendants.

23. I have excluded the Harnais and "H" watches from this list, finding that the short two year delay and the little, if any, resulting prejudice does not constitute laches.

24. Lederer and Artbag also assert that they "were both the subject of major stock acquisitions in the past five years." *See* Defs.' Mem. at 19. Furthermore, they claim that if not for

their reliance on Hermès' acquiescence, they would have channeled their business efforts elsewhere. *See id.* Moore claims that due to the current financial status of his business, Artbag would be forced to close if not for the sale of Hermès' copies. *See* Moore Dep. at 123. In addition, Lederer and Artbag assert that they have "laboriously cultivated" their businesses and goodwill through sale of their products. *See id.* Hermès contests the assumption that Lederer and Artbag could have "laboriously cultivated" their own goodwill based on sales of items that traded off of Hermès' goodwill.

countered with any genuine issues of material fact to preclude summary judgment. Courts have held that, under certain circumstances, the laches defense might bar plaintiff's claim for monetary relief, but not plaintiff's request for an injunction to prevent future infringement. *See* 5 *McCarthy* § 31:4. It would be inequitable to reward a plaintiff with monetary damages if it has waited for defendants to build up their businesses and profits before deciding to file suit. *See, e.g., Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331 (2d Cir.1975) (affirming finding of likelihood of confusion and injunction after bench trial, but denying monetary award and profits because of senior user's 10 year delay in bringing suit).

### 2. *Laches As A Bar to Injunctive Relief*

▉▉▉ Before considering defendants' motion barring plaintiff's request for injunctive relief, the balance of the equities must be weighed, including an analysis of defendants' intent and the public interest. *See Cuban Cigar*, 457 F.Supp. at 1096.

### a. Defendants' Intent

Defendants' intent is a crucial element in evaluating the equities in an estoppel by laches defense. *See Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916). Traditionally, estoppel is achieved through defendant's *good faith* reliance on plaintiff's failure to file suit promptly. *See* 5 *McCarthy* § 31:9. "While an infringer claiming laches need not be in total ignorance of another's mark, it must be able to demonstrate the absence of any intent to confuse and deceive the public; there must be a lack of evidence showing a scheme to foist upon the public the [products] of the defendant as those of the plaintiff." *Cuban Cigar*, 457 F.Supp. at 1098–1099.

Here, neither defendant used the name "Hermès" on its products. Moreover, Hermès has offered no proof that defendants deceptively attempted to "pass off" or "palm off" their products as genuine Hermès. In all instances in which Hermès' investigators asked defendants' salespersons the source of the products, the salespersons never responded "Hermès", but rather openly acknowledged that the products were Hermès "knock-offs" or copies. However, defendants explicitly informed their customers that due to the style and workmanship of the bags, no third party observer would be able to tell that a knock-off purchaser did not own a genuine Hermès bag. Therefore, while defendants did not intend to deceive their customers, they did attempt to encourage consumer confusion in the post-sale context.

### b. Public Interest

The trademark laws are intended, in part, to protect the public from confusion. Consequently, the public interest in not being deceived or confused must be considered in any application of the laches defense. *See Conopco*, 95 F.3d 187. The greater the likelihood of confusion, the more likely the defense of estoppel by laches will fail regardless of the length of plaintiff's delay. *See* 5 *McCarthy* § 31:10. Hermès has not offered evidence of any point-of-sale confusion. However, Hermès claims that barring its requested injunctive relief would permit confusion among consumers in the post-sale context. In other words, potential buyers would see others carrying or wearing the copied products and mistakenly believe they were made by Hermès. In a leading unfair competition and post-sale confusion case, *Mastercrafters Clock & Radio Co. v. Vacheron & Constantin–Le Coultre Watches, Inc.*, 221 F.2d 464, 466 (2d Cir.1955), the Second Circuit expressed concern that some consumers would purchase a junior user's cheap knock-off copy of a senior user's expensive clock "for the purpose of acquiring prestige." The harm to the senior user in such a case is that:

consumers could acquire the prestige value of the senior user's product by

buying the copier's cheap imitation. Even though the knowledgeable buyer knew that it was getting an imitation, viewers would be confused. Thus, the senior user suffers a loss of sales diverted to the junior user.

*Id.* The investigative audiotapes demonstrate that defendants' sales pitch appears to capitalize on the likelihood of post-sale confusion. While defendants' exploitation of the possibility of post-sale confusion may increase their sales at the expense of Hermès, I am not convinced that defendants' activity harms the *public* in the post-sale context. While Hermès' potential high-end customers may be confused in the post-sale context, these highly sophisticated purchasers will not be confused at the point of sale. Therefore, the public interest does not compel the rejection of the laches defense. For the reasons set forth above, plaintiff's claim for injunctive relief is barred based on laches.

As noted earlier, the laches defense applies only to defendants Artbag and Lederer's sale of the products at issue in this lawsuit with the exception of the Harnais and "H" watches. It does not apply to sales by others or sales of copies of different products or designs Hermès may create in the future.

## IV. Attorneys' Fees

"The court in exceptional cases may award reasonable attorneys' fees to the prevailing party." 15 U.S.C. § 1117(a). Congress intended the attorneys' fees provision both to protect plaintiffs from wilful infringers and "to afford protection to defendants against unfounded suits brought by trademark owners for harassment and the like." *Noxell Corp. v. Firehouse No. 1 Bar–B–Que Restaurant,* 771 F.2d 521, 524 (D.C.Cir.1985) (quoting S.Rep. No. 1400, 93d Cong., 2d Sess. 5, 6 (1974), reprinted in 1974 U.S.C.C.A.N. 7136). The Second Circuit requires that the successful defendant applying for attorneys' fees show plaintiff's *bad faith* in bringing the suit. *See Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 797 F.2d 70, 77 (2d Cir.1986) (awarding attorneys'

fees to the defendant when the plaintiff brought suit only for the purpose of joining in defendant's profits). Here, defendants have not offered convincing evidence of Hermès' bad faith in bringing this litigation. Simply because plaintiff did not prevail against Artbag and Lederer does not suggest that it brought this suit in an attempt to bully defendants. Indeed, Hermès' reasonable, though unsuccessful, arguments against the application of the laches defense militates against a finding of bad faith. Therefore, defendants' request for attorneys' fees under 15 U.S.C. § 1117(a) is denied.

## V. Conclusion

For the foregoing reasons, defendants' motion for summary judgment on the ground that plaintiff abandoned its mark is denied. Defendant Artbag and Lederer's motion for summary judgment based on the laches defense is granted for some, but not all, of the copied products. Specifically, plaintiff's request for both monetary and injunctive relief against these two defendants with regard to sales of the Kelly, Constance, Trim, Evelyne, Bugatti, Birkin, and H-belt is barred by laches. The laches defense does not protect defendants from plaintiff's infringement claim with regard to the sale of the Harnais or "H" watches.

Defendants Lederer and Artbag have counterclaimed seeking a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Hermès' trade dress is unprotectable and Hermès' trademarks are invalid. While the Court suspects defendants may no longer wish to press these claims, the parties are directed to notify the Court within 21 days of the entry of this opinion as to whether defendants can or desire to press these counterclaims. A conference is scheduled for March 30, 1999 at 3:30 p.m. in Courtroom 12C.

SO ORDERED: